**FOREMOST INTERNATIONAL TOURS, INC., Plaintiff,**

v.

**QANTAS AIRWAYS LIMITED, Doe One through Doe Ten, Inclusive, Defendants.**

**Civ. No. 74–116.**

United States District Court, D. Hawaii.

July 26, 1974.

Melvin Y. Shinn, Honolulu, Hawaii, Kevin B. Hughes, Alexander Anolik, San Francisco, Cal., for plaintiff.

Allen W. Wooddell, Stuart E. Wolfe, Wooddell, Mukai & Ichiki, Honolulu, Hawaii, George N. Tompkins, Jr., Condon & Forsyth, New York City, for defendants.

## DECISION

PENCE, District Judge.

Founding its complaint upon past and present business activities between itself and Qantas Airways Limited (Qantas), as more fully set out hereafter, Foremost International Tours, Inc. (Foremost) has brought this antitrust action against Qantas.

Foremost alleges that Qantas violated Sections 1 and 2 of the Sherman Act and seeks monetary and injunctive relief under Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 1, 2, 15, 26. This court has jurisdiction under 28 U.S.C. §§ 1331, 1337. The matter is presently before the court on Foremost's motion for a preliminary injunction and Qantas' cross-motion for summary judgment. Evidence has been taken, and the preliminary issues have been argued and briefed.

*Findings of Fact*

1. Foremost is a corporation organized and existing under the laws of the State of Hawaii with its principal place of business in Honolulu, Hawaii.

2. Qantas is a public company incorporated in the State of Queensland, Australia, under the laws of the Commonwealth of Australia, with its principal place of business in Sydney, Australia.

3. Foremost is engaged in the business of packaging, producing and operating Royal Road Fly/Drive, Fly/Coach and Fly/Tour tour programs to Australia and New Zealand from the United States of America, Canada, and other areas. The relevant tour programs consist of (1) air transportation to Australia and New Zealand from the United States and Canada, and (2) a land portion of the tour consisting of hotel accommodations, sightseeing and land transportation in Australia and New Zealand.

4. Although no permit is on file with this court, it would appear that within the meaning of § 101(19) of the Federal Aviation Act of 1958, 49 U.S.C. § 1301(19), Qantas is the holder of a foreign air carrier permit issued by the Civil Aeronautics Board with the approval of the President of the United States pursuant to §§ 402 and 801 of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1372, 1461, authorizing Qantas to engage in foreign air transportation between, inter alia, the United States and Australia and New Zealand.

5. Prior to March 31, 1974, Foremost as tour producer and wholesaler and Qantas as the sponsoring airline, pursuant to agreement, conjoinedly marketed tour programs to Australia and New Zealand from the United States and Canada known as Royal Road Tours and which included Fly/Drive, Fly/Coach and Fly/Tour tours. Qantas furnished the air transportation and paid for, in part or sometimes all, directly or indirectly, advertising and promotional tour brochures for such tours. The brochures used were of distinctive format and colors. They were not protected by copyright. Foremost arranged for and operated the land portion of such tours.

6. The agreement pursuant to which Foremost and Qantas jointly marketed tour programs to Australia and New Zealand from the United States and Canada, known as Royal Road Tours and which included Fly/Drive, Fly/Coach and Fly/Tour tours, on its face appeared to be renewable annually at the sole option of Qantas. The annual term of the agreement was from April 1 to March 31. On November 7, 1973, Qantas verbally advised Foremost that the agreement would not be renewed beyond March 31, 1974 and subsequent written confirmation was given to Foremost by Qantas by letter dated December 13, 1973.

7. Foremost is a wholesaler of tour programs. Foremost does not sell its tour programs to the public directly but sells through retail outlets consisting of retail travel agents and ticket offices of

those airlines who are sponsoring or participating airlines in the tour programs produced by Foremost as a wholesaler.

8. Commencing April 1, 1974, Qantas commenced to market Fly/Drive, Fly/Coach, Fly/Tour and Fly/Rail tours to Australia and New Zealand from the United States and Canada through the in-house tour department of Qantas known as Qantas Holidays. The effect of this was to place Qantas, as an air carrier, in direct competition with Foremost in the marketing of such tour programs.

9. Foremost, as a wholesaler, after Qantas terminated their agreement, entered into an agreement with Air New Zealand effective April 1, 1974, whereby Air New Zealand became the sponsoring carrier of the Royal Road Tour programs packaged, produced, sold and operated by Foremost. Air New Zealand designated British Airways as a participating carrier in this tour program.

10. Qantas, commencing April 1, 1974, commenced selling its Fly/Drive, Fly/Coach, Fly/Tour, Fly/Rail tours from the United States and Canada to Australia and New Zealand directly through retail travel agent outlets and airline ticket office outlets, as well as sub-wholesalers. Its promotional brochures were almost identical in format and color to the 1973 brochures used by Foremost.

11. In 1967 the International Air Transport Association (IATA) filed Resolution 810D with the Civil Aeronautics Board pursuant to § 412 of the Federal Aviation Act of 1958, 49 U.S.C. § 1382. Resolution 810D defines principles under which inclusive tours may be operated by IATA members, such as is Qantas. IATA Resolution 810E contains rules applicable to tour operators such as Foremost who develop, organize and promote inclusive tours for sale by individual IATA travel agents via the scheduled services of IATA members such as Qantas. IATA Resolutions 810D and 810E were approved by the Civil Aeronautics Board pursuant to § 412 of the Federal Aviation Act of 1958, 49 U.S.C. § 1382, on March 23, 1967 in Order No. E–24886 in Docket 17828.

12. As required by § 403 of the Federal Aviation Act of 1958, 49 U.S.C. §. 1373, Qantas International Passenger Fares Tariff No. 3 was filed with and approved by the Civil Aeronautics Board, effective March 20, 1974. This tariff provides in pertinent part, with respect to South Pacific group inclusive tour fares, in Rule 82–A of said tariff, the following:

A. The tour must include in the published price and tour literature:

(1) Sleeping accommodation for the total duration of the tour in hotels, motels or commercially operated pensions;

(2) A program of sightseeing and/or entertainment features on at least half the number of days in the total trip.

B. The minimum selling price of the tour per passenger shall not be less than the applicable group inclusive tour fare plus U. S. $130 for the minimum stay plus $10 for each day of the tour in excess of the minimum stay for which tour features are provided.

The "minimum selling price" does but mean that when all properly allocable per-passenger costs of the tour are added up, that figure shall not fall below the $130 + $10 per excess day minimum of B, *supra*.

13. The group inclusive tour fare contained in Qantas' International Passenger Fares Tariff No. 3 is $674.10 between Sydney, Australia and West Coast points of the United States or Vancouver, Canada. Thus under Qantas' Tariff No. 3, Qantas cannot sell a South Pacific group inclusive 10-day tour for less than $ U.S. 674.10 + $130.00, viz., $804.10, even if the land portion should not "cost" Qantas $130.00.

14. Commencing April 1, 1974, Qantas has been selling a 10-day group inclusive tour to Australia at a price of

$805. Although Qantas broke down the tour as "costing":

    A.  Air fare—$674.10

    B.  Land transportation in the form of car rental—$40.84

    C.  Hotel Accommodations—$59.40

    D.  Ten percent commission on the gross land cost to the retail agent—$13.90

    E.  Gross profit for Qantas on the gross land cost—$17.57,

items C and E are "as phony as a $3 bill." The "hotel" price was deliberately solicited and secured by Qantas for the sole purpose of fictitiously complying with the truth in advertising requirements of the Federal Trade Commission of the United States. By the terms of the hotel's letter to Qantas (Ex. D2), the room rate purportedly was limited by the hotel to one tour of 15 persons on a once only basis, but in fact it was never intended to be used or sold by either Qantas or the hotel, and Qantas never sold any such tour. The "profit" was nonexistent and fictitious. Qantas used it only to pro forma comply with the Federal Trade Commission requirements and as a "bait and switch" sales technique.

15. On all its tours, Qantas bases its cost figures on what *it refers to as its* "in-house" exchange rate: $A 1.00=$US 1.485. The actual rate of exchange, as quoted by the Bank of America in San Francisco on April 1, 1974, when the Qantas tours went on the market, was $A 1.00 = $US 1.4925. It has remained virtually unchanged since that date.

16. Commencing April 1, 1974, Qantas has been selling a 14-day group inclusive tour to Australia at a price of $US 899.00. This encompasses the following (at Qantas' "in-house exchange rate"):

    A.  Air fare—$674.10

    B.  Land transportation in the form of car rental—$40.84

    C.  Hotel accommodations—$161.13

    D.  Ten percent commission on the gross land cost to the retail agent—$22.49

    E.  "Gross profit" on land portion of tour—44 cents.

If Bank of America exchange rates were used, a "loss" of 57 cents results.

17. Qantas does not allocate any of its overhead expenses, office administration, advertising or brochure expenses as "costs" in its representations to this court as to the "cost" of the land portion of any of its tours.

18. In April 1973 Foremost sold 310 (passenger) tours; in April 1974, 102. In May 1973 Foremost sold 581 tours; in May 1974, 65. In June 1973 Foremost sold 539 tours; as of June 20, 1974, 29.

19. Foremost as a tour wholesaler is not receiving any type of rebate, kickback or other form of payment in connection with its Royal Road Tour program being operated with Air New Zealand as the sponsoring airline.

20. Foremost pays a portion of the cost of promotional Air New Zealand Royal Road Tour brochures. It is required to pay for all trade advertising for its Royal Road Tours. Air New Zealand would provide national advertising.

21. Certain inquiries have been made by telephone of Qantas reservations staff in Honolulu since April 1, 1974, concerning Foremost's Royal Road Tours. On such occasions, Qantas reservations staff have furnished the person making the request with information relating to Qantas' Holiday Tours in the South Pacific rather than Foremost's Royal Road Tours. On at least one occasion Qantas switched a specific request for a Royal Road Tour to a Qantas Holiday Tour without informing the tour agent of the change.

22. The relevant market here involved is the packaging, producing, operating and marketing of "freewheeling" tours offered in conjunction with tour-basing airfares in tours from the United

States and Canada to Australia and New Zealand. Freewheeling tours are without fixed itineraries but making hotel accommodations and local transportation available to the tour passenger. They are commonly called Fly/Drive, Fly/Coach, Fly/Tour or Fly/Rail travel programs.

*Legal Analysis* I *And Conclusions*

This court is here faced with the recurrent and intricate task of applying the antitrust laws within a regulated industry, here the airlines. The five opinions rendered by the Supreme Court in the 1972–73 term have added all too little clarification to the confusion extant in the law on antitrust actions involving regulated industries.[1] *See* Robinson, Antitrust Developments: 1973, 74 Colum.L.Rev. 163 (1974). Defendant's motion for summary judgment is based on two arguments: (1) Qantas' entry into the South Pacific Fly/Drive inclusive tour market is exempt from the operation of antitrust laws because authorized by an IATA resolution that was approved by the Civil Aeronautics Board (CAB). (2) Foremost's remaining claims, based upon unfair competition and deceptive practices, are within the primary jurisdiction of the CAB.

■■ It is elementary that the Federal Aviation Act (Act) 49 U.S.C. § 1301 et seq., does not displace the antitrust laws in the air transportation industry. Pan American World Airways, Inc. v. United States, 371 U.S. 296, 304–305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). The Act therefore does not automatically immunize the allegedly monopolistic acts of Qantas in this case. Even assuming that the CAB has "approved" the entry of Qantas into the inclusive tour business[2] and that Qantas met the minimum inclusive tour prices required by tariffs filed with the CAB, it would not be exempt from the antitrust laws. Section 414 of the Act provides that "any person affected by any order [affecting air transportation] shall be . . . relieved from the operations of the 'antitrust laws' . . . insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." 49 U.S.C. § 1384.[3] The Supreme Court interpreted that provision in Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), which involved an antitrust claim that the airline had been injured by Hughes' control over the financing and flow of new aircraft to TWA. The Court found that the CAB had considered all of the

---

1. The Supreme Court applied the antitrust laws to a public utility and to a shipper in Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and Federal Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973), respectively; deferred to the Civil Aeronautics Board in Hughes Tool Co. v. TWA, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); required the Federal Power Commission to consider antitrust policies in Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); and referred a conspiracy charge to the Commodity Exchange Commission for initial investigation in Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

2. The evidence of "approval" is not entirely clear. Qantas cites IATA Resolution 810D (approved by CAB Order No. E–24598) as authorizing its entry into the inclusive tour business. This resolution is entitled "Inclu-

sive Tours Initiated by Members". But the term "initiated" is nowhere defined nor is the effect of the "approval" anywhere outlined.

3. Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the operations of the "antitrust laws", as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order. 49 U.S.C. § 1384.
   IATA Resolution 810D, which purports to approve the entry of airlines into the inclusive tour business, was filed with the CAB under section 412(a). This section requires every air carrier to file "agreements . . . affecting air transportation." 49 U.S.C. § 1382(a).

prior dealings between the parties each time it had approved Hughes' acquisition of increased control over TWA; and, furthermore, that the agency had required Hughes to obtain its approval in connection with all significant purchase and sale transactions between the two companies. 409 U.S. at 379, 93 S. Ct. 647. The Court accordingly held that the CAB's specific actions conferred immunity upon the transactions in controversy. The Court emphasized that

> "from 1944 through 1960 every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Each transaction was approved by the Board and each approval was an order under § 408, for the Board regarded its transactional orders as modifications or interpretations of its antecedent control order. Each of the modification orders recited a finding of the Board that the transactions were 'just and reasonable and in the public interest.'" *Ibid.*

While the entry of Qantas into the inclusive tour business and its pricing of tours according to tariffs might superficially appear to come within the terms of the statute as "authorized" by a CAB order, the CAB never carefully scrutinized or particularized these acts as required by *Hughes Tool.* The CAB approved IATA resolution 810D in memorandum Order No. E–24598. This purports to authorize all airlines to enter the inclusive tour business. Since the order is dated January 3, 1967, and Qantas only commenced operating its own tours after April 1, 1974, the CAB could not possibly have considered the consequences of Qantas marketing its own

tours in the Pacific market. Generally approving the entry of airlines into the inclusive tour business is a far cry from CAB's approval of "every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco," as in *Hughes Tool.*

Qantas' position that compliance with the minimum inclusive tour prices required by tariffs filed with the CAB exempts it from the operation of the antitrust laws is similarly untenable. Not only did the CAB approve 810D long before Qantas entered the inclusive tour market, but the CAB never analyzed the costings behind Qantas' land tour portions in its Fly/Drive tour prices charged the public. The relationship between the costs and the price of the land portion of the tours is a basis of this lawsuit. Since the CAB did not consider the costs of the land tour components to Qantas when it approved Qantas minimum tariff price, the agency scrutiny of the entry of Qantas into the inclusive Fly/Drive tour market and its pricing of tours was not sufficiently specific to immunize those transactions from the antitrust laws.

## II

■ Although section 414 does not exempt Qantas from the operation of the antitrust laws, this court concludes that entry of Qantas into the inclusive tour business and its below cost pricing practice, switching of tours, as well as the other charges of anticompetitive activity —terminating a business relationship, obtaining confidential information, imitating Foremost's brochures, boycotting, tyings, and dividing the market—are within the initial jurisdiction of the CAB under section 411. 49 U.S.C. § 1381.[4]

---

4. The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the

Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition. 49 U.S.C. § 1381.

That section provides that the CAB may, "upon its own initiative or upon complaint by any . . . ticket agent, . . . investigate and determine whether any . . . foreign air carrier . . . has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof."

█ Section 101 defines "Ticket agent" as "any person . . . who . . . negotiates for, or holds himself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts or arranges for, such transportation." 49 U.S.C. § 1301 (34). Foremost brochures state that:

> Yes, ROYAL ROAD TOURS were first to provide a Fly/Drive Tour in the South Pacific and continue to be first by offering once again, the popular Fly/Drive Tour to Australia FOR MUCH LESS than the normal air fare alone.

> .    .    .    .        .        .

> The Standard Fly/Drive Tour not only provides the roundtrip flight to Sydney with arrival transfer [etc.].

With its own brochures, Foremost purports to "arrange for" air transportation. Foremost is thus a ticket agent within the meaning of the statute and therefore has standing to file a complaint with the CAB against Qantas.

█ While the CAB's jurisdiction under section 411 includes the authority to investigate "unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof", Foremost argues that the CAB is not empowered to regulate the land tour business because it is not encompassed within the meaning of the phrase "air transportation or the sale thereof." Neither the legislative history of the Act nor the CAB's regulations crystallizes the meaning of that phrase.[5] The essence of plaintiff's complaint is that Qantas has subsidized the land portion of its below cost inclusive tours with profits from the sale of its airline seats. In this case, since Qantas' sales of the land tours and the air passage are deliberately intermixed, both should come within the meaning of the phrase "air transportation or the sale thereof." This court holds that the CAB has jurisdiction of such allegations in Foremost's complaint.

█ With the scope of the CAB's power in mind, this court therefore follows the course set by The Court in Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). It will exercise antitrust jurisdiction over the parties' controversy but stay most proceedings thereunder pending CAB's determination of Foremost's complaint before the CAB.[6] In *Ricci*, a member on a commodities exchange alleged that another trader and the exchange itself unlawfully conspired to deprive him of his membership. The

---

5. The CAB regulates inclusive tours. *See* 14 C.F.R. § 378 (1974). However, except for the provision that a Tour Prospectus be filed with the CAB, *id.* 378.10, the requirements of Part 378 govern "tour operators" and "foreign tour operators". Qantas is not a foreign tour operator within the meaning of that section, *id.* § 378.2(d-1), and, therefore, not directly governed by § 378.12, which prohibits tour operators and foreign tour operators from engaging in "unfair or deceptive practices or unfair methods of competition." However, this court will not impute to Congress or to the CAB the anomaly of regulating under the Federal Aviation Act, tours operated by non-airlines, while ignoring the excesses of airline tour operators.

6. In Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Supreme Court held that courts should dismiss complaints presenting questions entrusted by Congress to the CAB. However, in light of The Court's applying the Sherman Act to a public utility's refusal to sell power at wholesale in *Otter Tail*, and its referring an alleged conspiracy to the Commodity Exchange Act in *Ricci*, if *Pan American* were decided today, this court, too, concludes that The Court would refer the dispute to the CAB for a preliminary determination rather than dismiss the action outright. *Cf.* Robinson, *supra*, at 178.

Court held that, although the Commodity Exchange Act did not unambiguously provide Ricci with an opportunity to seek complete redress, *Id.* at 304, 93 S. Ct. 573, the complaint should first be referred to the agency, stating:

"This judgment rests on three related premises: (1) that it will be essential for the antitrust court to determine whether the Commodity Exchange Act or any of its provisions are 'incompatible with the maintenance of an antitrust action,' Silver v. New York Stock Exchange, [373 U.S. 341, 358, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)]; (2) that some facets of the dispute between Ricci and the Exchange are within the statutory jurisdiction of the Commodity Exchange Commission; and (3) that adjudication of that dispute by the Commission promises to be of material aid in resolving the immunity question." *Id.* at 302, 93 S.Ct. at 580.

*Ricci* points out that, in certain instances, courts are unable, without agency expertise, to minimize conflicts between regulatory statutes and the antitrust laws. This rationale thus compels referral of the instant case to the CAB. Many of Foremost's charges of anticompetitive activity by Qantas, especially its entry into the inclusive tour market and its subsidizing of the land tour portions with profits from airline seats, are eminently within the CAB's expertise. Operation and sale of inclusive tours by airlines and subsidizing this portion of their operation in order to sell more

seats might well be in the public interest. Vertical expansion apparently has lowered the costs of tours to the public and mayhap should be encouraged. Other airlines might also vertically expand and compete with Qantas, thus adequately protecting the public. This court feels that it would be better equipped to make the determinations necessary under the antitrust aspects of this case with some enlightenment from the CAB.

This procedure does not prejudice Foremost. Should the CAB determine that Foremost is not a "ticket agent" within the meaning of the Act, or that the inclusive tour business is not within the scope of the CAB's jurisdiction, or should refrain from action for any reason, this court would, of course, then undertake to decide the complex problems of vertical expansion and subsidies in the airline industry, and their actual or possible antitrust implications without CAB assistance.

### III

■ This court is aware of the language in *Pan American, supra,* that section 411 of the Act leaves to the CAB questions of injunctive relief in certain areas. 371 U.S. at 310, 83 S.Ct. 476. However, underlying this interpretation is the conclusion that if "courts . . . intrude independently with their construction of the antitrust laws, two regimes might collide." *Ibid.* Neither the Act nor the regulations appear to authorize the CAB to grant the preliminary relief Foremost seeks.[7] Since

---

7. In 1972, Congress vested the CAB with specific authority to suspend or reject the tariffs of foreign air carriers. Act of Mar. 22, 1972, 86 Stat. 96, Pub.L. 92–259. Thus, the CAB has jurisdiction to grant preliminary relief against foreign air carriers in certain instances:

With respect to any existing tariff of an air carrier or foreign air carrier stating rates, fares, or charges for foreign air transportation, . . . the Board . . . may suspend the operation of such tariff . . . for a period . . . not exceeding three hundred and sixty-five days. . . . 49 U.S. C. § 1482(j)(2).

However, it does not appear that the CAB has jurisdiction under this section to suspend the inclusive tour fares of Qantas. The statute resulted from Lufthansa's low proposed excursion air fare. 1972 U.S.Code Cong. & Admin.News pp. 2100, 2101. The House Report states that the "legislation is, however, strictly limited in its scope and does not pretend to solve all of the ills and problems of international air transportation." *Id.* at p. 2102. More specifically, the Report further states that the bill applies to "charges for foreign air transportation." *Id.* at p. 2103. The Report nowhere discussed inclusive tour fares. Therefore, the

a preliminary injunction by this court does not interfere with the CAB's jurisdiction, *Pan American* does not preclude giving the limited injunctive relief herein sought. Just as litigants may sue for damages alleged to have occurred by reason of antitrust violations of the kind with which the CAB has authority to deal only by issuing a cease and desist order, Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 489 F.2d 203, 208 (9th Cir. 1973), antitrust litigants are entitled to preliminiary injunctions when warranted by law and fact. *Cf.* Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed. 2d 52 (1963).

■■ The danger that Foremost will suffer irreparable injury before the CAB has investigated the charges of deceptive practices and unfair methods of competition is very real. Foremost has established that the existence of its business life as a competitor in the free-wheeling tour market is threatened. This is a sufficient showing of irreparable injury to warrant a preliminary injunction even though the amount of direct financial harm might be ascertainable. Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970)

(per Friendly, J.); 11 C. Wright & A. Miller § 2948 at 440 (1973). Courts should be particularly concerned with threats to the existence of a moving party's business in the area of antitrust. An award of only money damages in lieu of preserving a competitor disserves the public interest.

■ Qantas argues that Foremost has not demonstrated that it is suffering irreparable harm as a result of Qantas' conduct. It argues that Foremost's injury results solely from the depression in the airline and tour industry: fewer people are traveling from the United States to the South Pacific. However, a plaintiff seeking relief under Section 16 of the Clayton Act need not show actual injury caused by defendant's anticompetitive conduct. He "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur (citations omitted)." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, (1969). Since Qantas' below cost pricing and other anticompetitive actions establish a prima facie violation of the antitrust laws,[8] Foremost

---

CAB can only deal with the allegations in Foremost's complaint by issuing a cease and desist order under § 1381.

In the event the CAB interprets broadly its jurisdiction under § 1482(j) and suspends or modifies Qantas' inclusive tour fares, this court would then terminate any portions of the preliminary injunction thus jointly acted upon. This procedure satisfies the rule of *Pan America* that courts are to avoid interfering with the CAB.

8. Entirely distinct from monopolization, § 2 of the Sherman Act may be violated by an attempt to monopolize, even though the desired end of monopoly power is not attained. *See* American Bar Ass'n, Antitrust Developments 1955–1968 (1968) at 37. Plaintiffs need only prove a specific intent to monopolize and the dangerous probability of success. *See, e. g.,* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Cornwell Quality Tools Co. v. C. T. S. Co.,

446 F.2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972).

Since intent to monopolize can be proved by direct evidence only in rare instances, plaintiffs must establish the requisite intent with circumstantial evidence. Foremost has made an unrebutted prima facie showing that Qantas is marketing its tours below cost. Below cost pricing may be evidence of violations of the antitrust laws. Bergjans Farm Dairy Co. v. Sanitary Milk Producers, 241 F.Supp. 476, 483 (E.D.Mo.1965), aff'd, 368 F.2d 679 (8th Cir. 1966); cf. National Dairy Prods. Corp. v. United States, 350 F.2d 321, 330 (8th Cir. 1965), vacated and remanded on other grounds, 384 U.S. 883, 86 S.Ct. 1913, 16 L. Ed.2d 995 (1966). The evidence also establishes that, at least on one occasion, a Honolulu travel agent requested from Qantas a Foremost Royal Road Tour, but was given a Qantas Holidays Tour.

The evidence also satisfies the requirement of a dangerous probability of success. Qantas controls a significant portion of the per week seat capacities in the United States–

need not now prove that its present loss of business results from Qantas' activity. As a result of below cost pricing by Qantas, it follows that future passengers to the South Pacific will purchase Qantas tours rather than Foremost tours, and Foremost will be irreparably injured.

■■■ Foremost seeks to enjoin Qantas from operating any tours to Australia or New Zealand. However, this form of an injunction would unduly burden Qantas. Foremost is adequately protected by an order, inter alia, enjoining Qantas from selling its tours at prices that do not include all of the costs actually attributable to the land portions plus a reasonable allocation of its office administration and general overhead expenses and, further, prohibiting Qantas from shifting to itself business committed to or intended for Foremost.

### ORDER

In accordance with the foregoing findings and conclusions, it is ordered, adjudged, and decreed that:

1. Foremost's Motion for a Temporary Injunction restraining and enjoining Qantas from operating an in-house tour program in the South Pacific tour market in competition with Foremost is Denied.

2. The matters alleged in the complaint relating to the questions whether an airline such as Qantas may conduct an in-house tour operation, whether the acts of Qantas alleged in the complaint constitute unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof and whether the acts of Qantas alleged in the complaint have anticompetitive effects, are within the initial jurisdiction of the Civil Aeronautics Board under § 411 of the Federal Aviation Act of 1958, 49 U.S.C. § 1381.

Further proceedings in this case in respect of these matters are stayed pending review, consideration, determination and findings by the CAB of these matters in accordance with § 411 of the Act.

3. The court retains jurisdiction of the alleged antitrust violations, including but not limited to alleged sales below cost, alleged shifting of tour requests, the alleged conspiracy with Canadian Pacific Airlines Limited and their alleged refusal to deal. The preceding is not to be interpreted as manifesting any intent by this court to restrict the scope of the CAB's investigation of and rulings upon any or all of the issues presented by Foremost's complaints. The motion of Qantas for dismissal of the complaint and summary judgment is Denied as to this aspect of the case.

4. Not enough evidence has been presented at this stage of the proceedings from which the court can conclude that there is a conspiracy with Canadian Pacific Airlines Limited to monopolize or exclude Foremost from the South Pacific tour market or that Canadian Pacific Airlines has refused to deal with Foremost. Accordingly, no preliminary injunction shall issue with respect to these allegations in the complaint and Foremost's motion in that respect is Denied.

5. Pending final determination of this action, Qantas is hereby restrained and enjoined from selling inclusive "freewheeling" tours until it has satisfied this court that the portion of the tour price applicable to the land costs includes not only the actual costs charged to Qantas for the land services, including ground and local air transportation services and hotel accommodation, but also generally including, but not limited to, administration expenses, office expenses, salaries, general in-house expenses and, possibly, advertising and bro-

South Pacific market, and is owned by the Australian government. With this leverage and its ability to absorb costings and overhead in its air fare, it poses as an awesome competitor in the inclusive tour market. The evidence also establishes that, by imitat-

ing Foremost's brochures of last year, Qantas is capitalizing on the good will accumulated by its former associate. While the evidence presented might not establish that Foremost will certainly prevail at trial, it clearly supports a preliminary injunction.

chure costs, related to Qantas' Holiday tours.

6. Pending final determination of this action,

(a) Quantas is hereby restrained and enjoined from continuing to advertise or otherwise offering for sale or selling any of its inclusive South Pacific tours, currently offered, at the prices now set forth in its tour brochures and other advertising media until it has satisfied this court that the land tour portion thereof meets and correctly reflects Qantas' costs, as set out in number 5, *supra*, and this court has approved the same.

(b) In implementing the above restraints,

(1) within 30 days after the effective date of this order, Qantas shall withdraw or otherwise nullify the current authenticity of all of its brochures that contain the above proscribed tour prices;

(2) within 60 days after the effective date of this order, Qantas shall withdraw from its advertising in any news media any reference to the above proscribed tour prices.

7. Pending final determination of this action, Qantas is hereby restrained and enjoined from shifting or attempting to shift to Qantas Holiday Tours, passengers who have requested or otherwise sought to purchase a Foremost Royal Road Tour to the South Pacific.

8. Foremost is hereby required, pursuant to § 16 of the Clayton Act, 15 U. S.C. § 26, to give security in the sum of $1,000.00 for the payment of such costs and damages as may be incurred or suffered by Qantas if found to have been wrongfully enjoined, as a condition precedent to the entry into effect of the preliminary injunction to be entered herein.

9. The effective date of the preliminary injunction shall be stayed by this court for a period of ten days from the date of filing in this court to allow Qantas to apply to the United States Court of Appeals for the Ninth Circuit for a further stay pending appeal from the granting of the preliminary injunction.