**FOREMOST INTERNATIONAL TOURS, INC., Plaintiff,**

v.

**QANTAS AIRWAYS LIMITED, Defendant.**

Civ. No. 74–116–JWC.

United States District Court, D. Hawaii.

Aug. 6, 1979.

Alexander Anolik, Richard J. Torre, Suzanne M. McDonnell of McDonnell & Weaver, San Francisco, Cal., Melvin Y. Shinn, Honolulu, Hawaii, for plaintiff.

George N. Tompkins, Jr., Michael J. Holland and Timothy J. Pfister of Condon & Forsyth, New York City, Linda M. Katsuki of Mukai, Ichiki, Raffetto & MacMillan, Honolulu, Hawaii, for defendant.

## OPINION

CURTIS, District Judge.

Plaintiff brings this action seeking monetary damages for alleged violations of Sections I and II of the Sherman Act and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 1, 2, 15 and 26.

## THE PARTIES

Plaintiff Foremost International Tours, Inc. is a corporation organized and existing under the laws of the state of Hawaii, having its principal place of business in the city of Honolulu, Hawaii. Foremost operates primarily as a tour wholesaler and, under the trade name Royal Road Tours, it packages, promotes and sells, through retail travel agencies, inclusive tours to Australia and New Zealand. Qantas Airways Limited is an international air carrier incorporated under the laws of the Commonwealth of Australia having its principal place of business in Sydney, Australia.

## BACKGROUND—RELATIONSHIP OF THE PARTIES

Within the market here at issue, tours such as those sold by the plaintiff are termed "inclusive" in that they consist of a package, the component parts of which are both the "land portion" e. g., hotel accommodations, car rental, motor coach transport and sight-seeing arrangements, as well as round-trip air transportation to the destinations selected by the passenger. An airline which of necessity must provide the latter service is termed the "sponsoring carrier" pursuant to rules imposed by the International Air Travel Association (IATA), whose membership is composed of international airlines and whose regulations must be approved by the Civil Aeronautics Board (CAB).

From 1969 through March 31, 1974, Qantas was the "sponsoring air carrier" for plaintiff's Royal Road Tours to Australia and New Zealand. In October of 1972, the parties reduced their relationship to a formal written agreement for the tour year effective April 1, 1973 to March 31, 1974. This contract was an exclusive agreement whereby certain of Foremost's Royal Road Tours would be available only to Qantas as sponsoring air carrier and such other participant air carriers as Qantas would designate. In consideration for this contract, the plaintiff agreed to use its best efforts to package and promote the tours and defendant agreed to provide the air transportation for same as well as to bear a portion of the promotional expenses and pay Foremost a commission for the passengers flying on defendants' airline.

Between 1969 and 1973, sales of the Royal Road Tours to the South Pacific increased as did the payments which Qantas made to the plaintiff pursuant to their joint effort. The record discloses that during the early part of 1973, Qantas actively considered acquiring a controlling interest in plaintiff's Royal Road Tour operation. Though preliminary negotiations were undertaken by the parties to this effect, the transaction was never consummated. Rather on November 7, 1973, Qantas informed Foremost of its intention not to renew their agreement due to expire the following March, and on April 1, 1974, Qantas itself entered the tour wholesaling market, packaging and selling inclusive tours through one of its divisions, Qantas Holidays.

The actions of Qantas which attended both the termination of its relationship with Foremost and its subsequent entry into the market at issue form the basis for the plaintiff's complaint.

## PROCEDURAL HISTORY OF THE ACTION

Foremost brought the instant suit on May 27, 1974 and simultaneously filed for a

preliminary injunction to prevent Qantas from conducting an in-house tour operation and from engaging in certain practices related thereto. After an evidentiary hearing, this court (District Court Judge Pence sitting) granted, in part, plaintiff's request for preliminary injunctive relief. *Foremost International Tours, Inc. v. Qantas Airways, Ltd.*, 379 F.Supp. 88 (D.Hawaii 1974), *aff'd*, 525 F.2d 281 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

Because certain of defendants' actions at issue fell within the regulatory jurisdiction of the CAB, this court exercised initial antitrust jurisdiction over the case but stayed most proceedings pending the CAB's determination of the issues raised in plaintiff's complaint to be filed with that body. 379 F.Supp. at 95.

Thereafter, a full evidentiary hearing was held before Administrative Law Judge Argerakis in which Qantas was found to have violated no provisions of the Federal Aviation Act, with the exception of a violation of Section 411, 49 U.S.C. § 1381, stemming from certain printing errors in its tour brochures which had the effect of misleading the public as regards the content of the tours advertised. On review before the CAB pursuant to 14 C.F.R. § 302.28, the decision of Judge Argerakis was affirmed and modified to the extent that the issue concerning the "exchange rate", discussed *infra*, was decided squarely in favor of Qantas. CAB Order 78–10–129.

In the proceedings before the CAB, the vast majority of the factual questions relating to the antitrust violations here alleged were litigated. Thus the decision of that body contained specific findings which would have exculpated the defendants here were these determinations binding on the district court in terms of its antitrust jurisdiction. On this basis, Qantas subsequently moved the court for an order vacating permanently the preliminary injunction and for summary judgment, arguing that the factual findings and legal conclusions of the CAB which related to the alleged Sherman Act violations were *res judicata* as regards the instant litigation. This motion was denied by oral ruling on January 4, 1979, the court finding that it owed no deference to the determinations of the CAB as far as the antitrust issues were concerned.

Qantas thereafter filed a Petition for a Writ of Mandamus and related relief to the Ninth Circuit Court of Appeals seeking to block relitigation of the antitrust issues in the district court. This motion, too, was summarily denied, as was defendants' subsequent petition for a Writ of Certiorari to the Supreme Court in this same connection.

Shortly before trial commenced, Qantas once more moved the court for an order estopping the plaintiff from relitigating any factual issues resolved in the proceedings before the CAB. This motion was denied in general, the court finding that the CAB was without jurisdiction to determine the antitrust issues in suit, given the limited regulatory authority delegated to that body by Congress. Memorandum and Order, April 6, 1979. However, the court did accept certain findings of the CAB as *res judicata* for purposes of the instant litigation, the enumeration of which is not material at this point. As this discussion continues any such findings of the CAB which the court has accepted as *res judicata* will be specifically indicated.

## ALLEGED VIOLATIONS UNDER SHERMAN I & II—ELEMENTS

Count One of plaintiff's complaint alleges that Qantas has monopolized the inclusive tour market in the South Pacific, has attempted to monopolize such market and has conspired with others to monopolize the market, all in violation of Section II of the Sherman Act, 15 U.S.C. § 2. Count Two of the complaint charges Qantas with an unlawful combination and conspiracy in restraint of trade in conjunction with Canadian Pacific Airlines Limited (CPAir) in violation of Section I of the Sherman Act, 15 U.S.C. § 1.

In the recent case *Cal. Computer Products v. Intern. Business Machines*, No. 77–1563, slip op. at 2172 (June 21, 1979), the Ninth Circuit articulated in some detail the

requisite elements to be established in a case involving alleged violations of Section II of the Sherman Act.

■ Where the charge is monopolization, three elements must be proven: (a) the possession of monopoly power in the relevant market, (b) the willful acquisition or maintenance of that power, and (c) causal antitrust injury. *Cal. Computer Products*, slip op. at 2181. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power "is the power to control prices or exclude competition", and is often defined with reference to defendant's share of the relevant product and geographic market. *Cal. Computer Products*, slip op. at 2181; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ The second element of a monopolization claim requires that the defendant is shown to have engaged in "willful" acts directed at establishing or retaining its monopoly. No specific intent to monopolize need be shown, nor do defendant's acts need to have been unlawful if undertaken by an ordinary enterprise, unendowed with monopoly power. "[T]he test is whether the defendant's acts, otherwise lawful, were *unreasonably* restrictive of competition." *Id.* at 2182; *Gough v. Rossmoor Corp.*, 487 F.2d 373, 376 (9th Cir. 1973). In this sense, the second element under Sherman II analysis is similar to that under Sherman I, the key distinction being that in a case involving the latter provision, a conspiracy must also be shown.

The third element, that of causation, is largely related to standing and need not be discussed at length for reasons hereinafter appearing.

■ There are four elements to a claim under the "attempt to monopolize" provision of Sherman II: (a) specific intent to control prices or destroy competition with respect to a part of commerce, (b) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, (c) a dangerous probability of success, and (d) causal antitrust injury. *Cal. Computer Products*, slip op. at 2183.

■ Absent direct proof, the "specific intent" requirement may be established by proof of a Section I violation resulting in a substantial restraint of trade. Although market power is a relevant consideration to the determination of intent, where a Section I violation is established, intent may be inferred. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977). A permissible inference of intent may also arise in conjunction with proof of illegal predatory conduct; since specific intent is difficult to establish by direct evidence, such inferences often form the basis for the imposition of liability. *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8 (9th Cir. 1973).

■ The second element under the attempt provision of Section II, that of "predatory conduct", requires proof of illegal activity directed to effectuate an *unreasonable* restraint of trade. Such conduct may involve contracts or agreements between parties or unilateral action by one antitrust offender. *Cal. Computer Products*, slip op. at 2184; *Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488 (9th Cir. 1977).

■ "Dangerous probability of success", the third element to be considered, may be established either by direct proof of market power or by inference from proven specific intent to monopolize. *Cal. Computer Products*, slip op. at 2184.

The final causation element is similar to that under an actual monopolization claim and is primarily a standing question.

■ The elements of a claim arising under Section I of the Sherman Act are as follows: (a) the existence of a combination or conspiracy, (b) entered into by the parties in order to achieve monopoly power and effectuate an unreasonable restraint of trade, and (c) causal antitrust injury. *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976). While claims under Section I are limited to those involving concerted activity, the analysis entailed is similar to that undertaken under monopolization

claims pursuant to Section II, the emphasis being upon evidence of an *unreasonable* restraint of trade resulting from action undertaken pursuant to the conspiracy or agreement.

## RELEVANT MARKET

An essential initial determination regarding claims under either Sherman I or II involves definition of the relevant market within which the violations are said to have occurred. *Continental T. V. Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1973). In the instant case, plaintiff contends that the market upon which the court's inquiry must focus is that in which both Foremost and Qantas competed: the wholesaling of inclusive tours to Australia and New Zealand which were available to purchasers in North America, Europe, Japan and Southeast Asia. Foremost's position is straight forward; since the travel locations are unique and the species of tours at issue form a distinct category of travel offerings, the relevant market is thus clearly defined. Further argued is the absence of cross-elasticity between these tours and the many others on the market due to the fact that the travel destinations involved offer sight-seeing and leisure opportunities to the tourist which are unavailable elsewhere.

Defendants assert that plaintiff has failed to establish an accurate definition of the relevant market. This argument is two-tiered.

First, Qantas at trial offered the coined term "discretionary dollar" as indicative of the actual market within which all tour wholesalers compete. In theory, according to defendant, entities providing travel packages actually compete with the manufacturers of mink coats, yachts and similar luxury items, the purchase of which is possible only where the prospective buyer possesses the requisite "discretionary" income beyond that needed to sustain the basic essentials of life.

I do not accept this "discretionary dollar" argument, for were antitrust courts to adopt it, no plaintiff in the business of providing luxuries to the consumer could ever establish a viable relevant market for purposes of the Sherman Act.

The second argument offered by defendants is more plausible in that it at least focuses on the travel market itself. Qantas claims that, within the tour wholesale marketplace, many destinations are cross-elastic with each other, including those here at issue. Specifically, defendants argue that tours to various points on the globe are actively considered by those who may eventually purchase a package to the South Pacific. For this reason, defendants assert that the relevant market for purposes of this case is that encompassing the worldwide tour wholesaling market, rather than that argued by plaintiff.

The burden is of course on Foremost to establish the relevant market as a requisite to proving its case. *Gough v. Rossmoor Corp.*, 585 F.2d 381 (9th Cir. 1978). The court, after hearing the evidence adduced at trial, is persuaded that this burden has been met. It appears that the travel destinations here involved are indeed unique in terms of what they offer to the tourist. For this reason the degree of cross-elasticity argued by the defendants is negligible and the court therefore adopts the plaintiff's definition of the relevant market for purposes of the instant case.

## THE QUESTIONS OF CAUSATION AND MONOPOLY POWER

For purposes of the following analysis, proof of causation will be accepted provisionally with little comment. The court assumes that plaintiff, if it could demonstrate the violations alleged, would sustain some form of cognizable antitrust injury as a result of such violations, plaintiff being in direct competition with the defendants in the relevant market. 15 U.S.C. § 15; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

As to the issue of monopoly power, a key element of the "monopolization" claim under Sherman II, and one of inferen-

tial significance as regards the other claims asserted, the court makes no finding. However, the court is unpersuaded by plaintiff's argument to the effect that merely because Qantas is a major air carrier to the South Pacific and a member of IATA, it possesses the requisite monopoly power to satisfy the demands of the Sherman Act. Furthermore, plaintiff has offered no concrete evidence regarding the market share of the defendant where such factor is usually a key component in a case involving allegations of monopoly power. *See, Greyhound Computer Corp. v. IBM*, 559 F.2d 488 (9th Cir. 1977). Since the bulk of the evidence adduced at trial concerns the conduct of the defendants and a proper determination as to the nature of this conduct, further inquiry into the monopoly power of the defendants at this time is unnecessary.

## ALLEGED PREDATORY CONDUCT

The alleged predatory acts of Qantas complained of in plaintiff's complaint are voluminous and for purposes of analysis may be categorized in the following manner: (1) Conduct of Qantas prior to the termination of its relationship with Foremost, (2) conduct of Qantas subsequent to the termination allegedly directed specifically against Foremost, and (3) post-termination conduct of Qantas attending its entry into the tour wholesaling market but not specifically directed against Foremost.

## PRETERMINATION CONDUCT

At trial, plaintiff attempted to show that certain actions taken by Qantas pursuant to its contractual agreement with Foremost were of a predatory nature, undertaken by the defendant at a time when its intention to enter the market was formulated but unrevealed to the plaintiff. The evidence adduced consisted largely of the testimony of the owner of Foremost, Mr. Ronald Fenwick, and of internal Qantas memoranda, all relating to the tentative negotiations between the parties regarding a possible acquisition of Royal Road Tours by the defendants. While the record indicates that selling price and other terms were discussed, it is equally clear that no formal agreement was ever consummated despite the apparent good faith efforts of certain Qantas executives to convince their superiors of the advantages of the deal.

Evidence was also introduced establishing that, during the period of these negotiations, certain data were supplied by Foremost to the defendants regarding plaintiff's operations. This information took the form of business reports supplied by plaintiff as well as seminars conducted by Foremost and attended by Qantas employees in which the latter group was familiarized with the procedures followed in processing sales of Royal Road Tours. It should be noted that no trade secret or similar proprietary protection is claimed for the data here involved nor was any claim of confidentiality attached at the time of its delivery.

Plaintiff takes the position that it was induced by Qantas, through its discussion of a possible acquisition, to supply the information described above, while the defendant masked its intention to enter the market and utilized the expertise of Foremost, freely given, in order to "gear up" for its own entry into active competition with plaintiff. This assertion is unsupported in the record.

In light of the close working relationship between the parties, the exchanges of data appear to be pursuant to a bona fide joint effort to increase sales. As to the alleged misrepresentations regarding Qantas's possible future use of an in-house tour department, the record indicates that, while that alternative was considered during the time in question, no decision had been reached which would give rise to a presumption of something less than fair dealing on the part of Qantas. For these reasons, the court finds that the pretermination conduct of Qantas regarding its relationship with plaintiff does not constitute actions of a predatory nature under Sherman Act standards.

## POST–TERMINATION CONDUCT OF QANTAS ALLEGEDLY DIRECTED AGAINST PLAINTIFF

The second category of defendants' activities which plaintiff urges evidences preda-

tion involves those acts undertaken by Qantas subsequent to termination of its relationship with Foremost and which arguably were intended to have an unlawful effect on competition vis-a-vis the ability of Foremost itself to compete in the relevant market.

These actions fall into two groups. First, plaintiff cites a course of conduct allegedly designed by Qantas to permit it to unlawfully subsume plaintiff's position in the tour wholesaling market. Second, plaintiff argues actions allegedly intended by Qantas to deprive plaintiff of the ability to compete, i. e., defendants' unlawfully restricting Foremost's access to air transportation.

## THE ALLEGED ASSUMPTION BY QANTAS OF FOREMOST'S MARKET POSITION

Plaintiff, at trial, in asserting that Qantas unlawfully subsumed its position in the market, placed great emphasis upon a comparison of Qantas brochures with those of Foremost. Plaintiff argues that the pamphlets advertising both tours were so similar in color, format, size and design that Qantas's intention to displace Foremost can thereby be inferred, inasmuch as Royal Road Tours had been in the market years before the entry of Qantas. In addition, plaintiff argues that the components in the defendants' tours at issue were largely duplicative of those in its own packages, the overall similarities resulting in confusion in the mind of the public as to true identity of the entity providing each of the tours. Such confusion, it is argued, was intended by Qantas since it would inure to the airline's benefit, the defendants reaping the rewards of the good will generated by Foremost over the prior years.

Upon the basis of the evidence before it, this court concludes that defendant's brochures at issue, neither in format nor content, evidence an intent by Qantas to subsume Foremost's position in the market. The brochures are basically dissimilar and are easily distinguishable. Their size is of standard proportion and their colors, although somewhat similar in many instanc-

es, are in common use in the tour industry. The face of the brochures show the defendant's name in bold type and contains the unmistakable likeness of a Koala bear with which defendants have been associated for many years. Consequently, I do not find the brochures of the defendants deceptively similar to those of the plaintiff either intentionally or otherwise.

The congruence of the components offered in the tours of both entities is an unavoidable fact resulting from the generic categories of tours into which both those of plaintiff and defendants fall. For example, each party offers the "fly/drive" tour which, by definition, contains air transportation and car rental arrangements. Thus the similarity in components is to be expected and in no way supports an inference of predation as urged by plaintiff here.

Plaintiff offered some evidence regarding alleged "switching tactics" on defendants' part whereby inquiries regarding plaintiff's Royal Road Tours were diverted by Qantas in an effort to push its own product. There was also some evidence of confusion which existed in the marketplace, immediately subsequent to Qantas's entry, as to exactly which entity, Foremost or Qantas, was providing which specific tour.

The evidence supporting the alleged "switching tactics" was unpersuasive for the purposes introduced, as was the testimony regarding the confusion resulting from defendants' commencement of its in-house operation. That Qantas employees mailed their own brochures to prospective customers is in no way predatory and the confusion in the marketplace is readily understandable in a situation such as this. Qantas entered a market in which Foremost continued to compete and the two entities had for years before been thought of as operating these types of tours in tandem.

The court is unpersuaded that any such conduct evidences predatory intent under the provisions of the Sherman Act.

The second species of conduct allegedly directed specifically against Foremost is that which arguably was designed to de-

prive it of the ability to compete. In this connection, plaintiff points to Qantas's refusal to book reserved seating space for Foremost tour passengers during the month of December, 1974. Evidence indicates that the "block space" bookings involved were "wait-listed" when requested, in conformance with Qantas policy since the quota reserved for such bookings was filled at the time in question for the flights indicated. It appears that Foremost was treated no differently than any other tour wholesaler similarly situated. Qantas, subsequent to the termination of its agreement with plaintiff, was of course under no obligation to render preferential treatment to Foremost. It is important to note that Qantas confirmed Foremost's requests for block space on other occasions subsequent to the termination.

Plaintiff further alleges an unlawful conspiracy between defendants and Canadian Pacific Airlines (CPAir) intended to eliminate Foremost as a competitor of Qantas. It is asserted that the alleged conspiracy had the effect of eliminating CPAir as a possible sponsoring air carrier for Royal Road Tours. It is this alleged conspiracy which forms the basis for Count Two of plaintiff's complaint, the Sherman I violation.

After Qantas had terminated its sponsorship of Foremost tours, Foremost approached CPAir as a possible successor to Qantas as a sponsoring air carrier. A representative of CPAir who lacked corporate authority to speak for the company ventured the opinion that such a joint venture would be unlikely because of a pooling agreement between Qantas and CPAir involving travel destinations for Foremost tours. CPAir had never been a sponsoring carrier for the plaintiff, nor was a formal proposal ever submitted by plaintiff to CPAir, since shortly thereafter Air New Zealand agreed to sponsor Royal Road Tours and a relationship was then established which continues to date.

No concrete evidence was advanced supporting plaintiff's contention that the Qantas/CPAir pooling agreement, sanctioned by IATA, was conspiratorial in nature under Sherman Act standards. Rather the evidence suggests that CPAir's reluctance to affiliate with Foremost was the product of an independent business judgment whereby that airline determined that the venture would not be advantageous as compared with the other commitments it had at the time, including the pooling agreement with Qantas.

■ Therefore, the alleged conspiracy between Qantas and CPAir cannot support a claim under either Section I or II of the Sherman Act.

■ In light of the foregoing, the court finds that none of the conduct undertaken by Qantas subsequent to the termination of plaintiff and allegedly directed specifically against Foremost to drive it from the market is the type of activity from which an intent to monopolize the relevant market can be inferred. Likewise, this conduct in no way constitutes an effort to achieve or exercise monopoly power as proscribed by the Sherman Act.

## POST–TERMINATION CONDUCT OF QANTAS NOT SPECIFICALLY DIRECTED AGAINST PLAINTIFF

■ The final category of allegedly predatory conduct on the part of Qantas consists of the following.

First, it is argued that Qantas deliberately included certain errors in its brochures at the time it entered the market, thereby deceiving the public to the effect that it was offering tours of a higher quality and at lower prices than those of its competitors. At the hearing before the CAB, the administrative law judge found that the brochures in question did contain errors and that such errors constituted a violation of section 411 of the FAA and would have to be corrected. In addition, it was determined at that hearing that no intent was shown on the part of Qantas to misrepresent the content or price of its tours. After considering the evidence produced at trial, I am in agreement with the latter finding.

As its second contention, plaintiff asserts that Qantas offered for sale to the public extremely low priced, but in reality, non-existent tour packages shortly after it went in-house. This charge stems from the advertisements of the defendants relating to the "$805 fly/drive tour" to Australia. The dispute focuses primarily upon the alleged non-availability of the hotel rate which Qantas used to cost the land portion of the tour. The evidence adduced at trial established that the rather low nightly charge indicated was bona fide, apparently provided by a hotel owner on a "one time only" basis in order to stimulate continued use by Qantas of the chain involved. Though no passenger ever purchased the "$805" tour, I concur with the finding of the CAB to the effect that the package, while available to a small number of potential travelers, was a legitimate tour offering which would have been provided to buyers on a "first come, first served" basis. Therefore, the advertisement of the "$805" tour does not evidence predation for purposes of the instant case.

Plaintiff further argues that Qantas's refusal to use the "Computour" system developed by Foremost prior to termination was a predatory act. Computour is essentially a computer program whereby special itinerary tours could be laid out and the cost of same determined with great speed and accuracy. Prior to the termination of their agreement, defendants purchased from plaintiff exclusive rights to the use of the system for a consideration of $90,000. After it entered the tour wholesale market, Qantas refrained from utilizing the program which apparently did not readily accommodate the type of product it was selling. Inasmuch as Qantas had purchased the rights to the system, it was under no obligation to permit plaintiff to utilize it or to redesign the system to suit its own needs. Therefore, I find that the purchase and subsequent non-use of Computour by defendants in no way constitutes predatory behavior.

## ALLEGED BELOW COST PRICING

At this juncture we come to the key issue in the litigation and the crux of plaintiff's case, the alleged below cost pricing of defendants' tours. In support of this contention, the plaintiff makes two arguments.

## CONVERSION RATE OF EXCHANGE

Plaintiff's first proposition is that Qantas is receiving United States dollars for the sale of its tours in the United States and Canada and is paying for land tour accommodations in Australia with Australian dollars, and that using the rate of exchange applicable to the conversion of United States dollars to Australian dollars during the relevant period results in a loss to Qantas in the land tour operation.

However, the defendant Qantas has demonstrated that no such conversion as argued by plaintiff takes place. It contends, and the evidence shows, that the great portion of the revenue which Qantas generates in this country is spent in the United States on the purchase of aircraft and parts, so that all United States dollars received here remain in the United States to be applied to such expenditures. To the extent that the expenditures here exceed revenue received in the United States, Australian dollars must be converted to United States dollars with which to pay the difference. Qantas is therefore justified in using the rate of exchange applicable to converting Australian dollars to United States dollars. If this rate is used in the computation, Qantas's sale of the land portion of the tour in Australia shows no loss.

■ The CAB, upon being presented with this same question, approved Qantas's conversion rate and method of computation. This court originally ruled that this CAB finding was *res judicata* here. However, under an offer of proof by both parties, this issue has been entirely relitigated. I therefore find that Qantas's election to use the rate of exchange applicable to the conversion of Australian dollars to United States dollars is proper as a reasonable business judgment utilizing a legitimate economy of integration, and that no inference of predation can be drawn therefrom.

## ADMINISTRATIVE EXPENSE AS ELEMENT OF COST

Plaintiff's second argument in support of its contention that the land portion of the tours are being sold below cost is far more complex and far reaching. To begin with, the defendants admit that they supply their land portion of the tours to their customers at their actual cost of acquisition, and that no administrative expense incurred in connection therewith is charged to the passengers. It is Qantas's position that the land components offered in the tours are, in essence, an accommodation which it affords to its customers in order to stimulate air travel and that any administrative effort undertaken in this regard is absorbed by its regular staff without additional expense.

In answer to this contention, plaintiff insists that arranging the land accommodations involves administrative overhead, some allocable portion of which must properly be assigned to defendant's average variable cost in conducting its wholesale tour operation. Further, if any such expense is charged to defendant's costs incurred in supplying the land portion of the tours, sales of such tours result in a loss.

The court is persuaded that there is some measure of administrative expense properly allocable to the land tour operations which should be included in any computation of profit or loss resulting from such operation. If we were therefore to apply strict Areeda-Turner analysis as adopted by the Ninth Circuit, it would appear that Qantas has provided the land portion of its inclusive tours at below its average variable costs. *Janich Bros. Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir. 1977); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). In another environment this might well constitute predation and a *per se* violation of Sherman II.

## SHERMAN ACT CONCEPTS APPLIED

Let us then turn to the task of applying Sherman Act concepts to the factual situation with which we are presently confronted. As indicated above, Qantas is an inter-national airline carrier engaged in the business of providing and selling air transportation. As such, it is primarily in competition with other airlines performing the same function, all of whom are operating in a highly regulated field under the supervision of the CAB. The inclusive tour concept by which land transportation and accommodations are furnished at cost to customers of Qantas who purchase air transportation is conceived of by Qantas as a promotional program designed to stimulate air travel on its line and thus improve its competitive position with other airlines. There is little evidence to indicate that Qantas, in offering such an inclusive tour, had any predatory intention directed toward Foremost or anyone else.

In the last analysis, plaintiff's claim that the "below cost" pricing of Qantas is "predatory" must be tested by an examination of the definition of that term in an antitrust context. Such definition is clearly stated in *Janich Bros., Inc., supra* :

> "Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits . . .. Therefore, the product must be such that if predatorily priced, rivals are likely to be driven out of the market or excluded, allowing the firm to raise prices." (Citations omitted.) 570 F.2d at 856

Plaintiff's argument fails for two reasons. First of all the environment which the record here discloses is simply not the kind of setting in which the evils of "predatory pricing" as defined by *Janich* are likely to occur. There is nothing in the record to suggest that Qantas is presently foregoing profits on its tour operation which it later intends to recoup from increased prices. To the contrary, the entire tour packages offered by Qantas were and are quite profitable to the airline and, in this sense, no real "losses" are sustained in connection therewith.

An argument can be made that the uncharged administrative expenses at issue constitute a "loss" to be later recouped.

However, it is abundantly clear that the primary purpose of all Qantas's programs is to sell seats on its airplanes, thus generating the considerable airfares which are the real profit incentive behind the tour offerings at issue. Thus, when viewed in this context, the significance of the administrative expenses involved in the land portion of the tours becomes *de minimis*. Moreover, any future increases in the price of the tours offered will be automatically reviewed by the CAB.

Second, there is no evidence in the record to support a finding that tour wholesalers such as Foremost are likely to be driven out of business due to the practices here complained of. The plaintiff had no difficulty in finding another airline to sponsor its tours and operates profitably to this date. More significantly, the record discloses that the number of competitors in the relevant market has dramatically increased rather than decreased since Qantas went in-house. Whereas, in 1974, there were only four tour wholesalers providing tours of the type with which we are here concerned, there are at present at least nine such entities, including the plaintiff itself, actively competing for shares of the market.

Thus, Foremost has not established "predatory" pricing on the part of the defendants, as the meaning of that term is applied to cases involving the Sherman Act. Moreover, the plaintiff has failed to demonstrate any tangible injury to competition arguably produced by Qantas's entry into the tour wholesale market.

Finally, plaintiff argues that it would be contrary to Sherman Act principles to permit a member of a comprehensively regulated industry such as Qantas, which enjoys profits resulting from a governmentally guaranteed rate structure, to use a portion of revenues earned in this fashion to subsidize its economic endeavors in an unregulated sphere.

If we analyze the alternatives in the context of this case, it would appear that if such cross-subsidization were allowed it would arguably hamper the ability of the independent tour wholesaler to compete in the relevant market but it would definitely benefit the consumer by bringing about lower tour rates.

If, on the other hand, such cross-subsidization were not permitted, the position of the independent tour wholesalers in the market would be protected but the consumer would be deprived of lower tour fares.

It would appear therefore that we have a question of policy as to whether the independent tour wholesaler should be protected at the expense of the consumer, or whether the consumer should be required to pay higher tour rates in order to permit the independent tour wholesalers to more effectively compete with the airlines in the land tour market. A policy question of this nature is more appropriately addressed to a legislative body.

To some extent Congress has addressed itself to the problem in the enactment of the Federal Aviation Act and the creation of the CAB, one of the functions of which is to guard the "public interest" in the aviation field. This agency has approved Qantas's inclusive tour program and has found it compatible with those standards of "public interest" which it is required to apply in such cases as this. While the CAB rulings in this respect are not conclusive in this antitrust action, its decision on this important issue is nevertheless persuasive.

■ I find therefore that the evidence adduced in this case fails to establish predatory conduct or predatory intent on the part of the defendants, and I further find that Qantas's entry into the wholesale tour market under the circumstances indicated, neither was designed to effect nor results in an unreasonable restraint of trade within the relevant market at issue. The evidence likewise fails to show any unlawful conspiracy. Accordingly, judgment shall be for the defendants with costs.

## DEFENDANTS' COUNTERCLAIM

Defendant Qantas Airways, in the instant action, has asserted a counterclaim against plaintiff in its amended answer of September 10, 1974. This counterclaim states six

causes of action, four which allege acts of unfair competition and violations of resolutions of the International Air Transport Association (IATA) which have the force of law under the FAA, 49 U.S.C. § 1301, *et seq.* and two causes alleging breach of contract. Plaintiff has here moved for dismissal of all counterclaims pursuant to Fed.R. Civ.P. rule 41(b)(c).

At trial, Qantas apparently elected to abandon its claims against the plaintiff as no argument regarding them was offered by Qantas's counsel and little evidence was introduced relating directly thereto. Although certain of the evidence adduced at trial in connection with plaintiff's case in chief and the Qantas defense has inferential significance as regards defendants' counterclaims, such evidence falls far short of that needed to support the counterclaims in this case. For these reasons, the motion of plaintiff to dismiss the counterclaims of Qantas is hereby granted.