CORNWELL QUALITY TOOLS CO.,
Plaintiff-Appellant,

v.

C. T. S. COMPANY, Inc., Defendant-
Appellee.

CORNWELL QUALITY TOOLS CO.,
Plaintiff-Appellee,

v.

C. T. S. COMPANY, Inc., Defendant-
Appellant.

Nos. 24914, 24969.

United States Court of Appeals,
Ninth Circuit.

June 24, 1971.

Rehearing and Rehearing In Banc
Denied Aug. 31, 1971.

Les J. Weinstein (argued), Aaron M. Peck, Brian R. Silver, of McKenna & Fitting, Los Angeles, Cal., Milton Davis, Beverly Hills, Cal., for C.T.S. Co., Inc.

John M. Glenn (argued), Richard A. Chenoweth, of Buckingham, Doolittle & Burroughs, Akron, Ohio, Dean C. Dunlavey, of Gibson, Dunn & Crutcher, Los Angeles, Cal., for Cornwell Quality Tools.

Before MERRILL, ELY and HUF-STEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Cornwell Quality Tools Co. ("Cornwell") and C.T.S. Company, Inc. ("CTS") filed cross-appeals from the adverse portions of the district court's judgment entered after each party had moved successfully against the other for directed verdicts.

The case breaks into four parts: (1) Cornwell's claim against CTS to recover the purchase price of merchandise it sold to CTS, its former distributor, and CTS's set-off and counterclaim against Cornwell charging breach of a claimed

oral contract to repurchase the inventory upon termination of CTS's distributorship; (2) CTS's counterclaims against Cornwell for treble damages based on alleged violations of the federal antitrust laws; (3) Cornwell's counterclaim against CTS charging a violation of the federal antitrust laws; and (4) Cornwell's contention that the district court erred in taxing costs.

Cornwell, an Ohio manufacturer of mechanics' hand tools, entered an agreement with CTS in 1956 whereby CTS became Cornwell's sole distributor in California and Nevada. CTS entered contracts with dealers to whom were assigned specified territories. The dealers, sometimes called "wagon men," made sales from trucks to the ultimate consumers, usually mechanics. That mode of distribution was used by three manufacturers operating in California and Nevada: Cornwell, Snap-On Tools Corporation of Kenosha, Wisconsin ("Snap-On"), and Mac Tools Corporation of Sabina, Ohio ("Mac").

In 1964, differences arose between CTS and Cornwell, the responsibility for which was hotly contested. According to Cornwell, the relationship deteriorated because CTS made a distribution deal with its competitor Mac, intending to obtain all of Mac's and Cornwell's dealers and to restrict competition in Nevada and California to itself and Snap-On. CTS entered a course of conduct whereby Cornwell would lose its distribution system in CTS's territory unless Cornwell acquiesced in CTS's selling both Cornwell's tools and Mac's. Cornwell refused to yield and, instead, set up its own warehouse in California and began selling directly to dealers. CTS's version is very different. CTS claims that Cornwell had decided in 1963 to eliminate distributors and to undertake direct sales to dealers. Cornwell pursued its plan to squeeze out CTS. To protect itself from Cornwell's machinations, CTS made the agreement with Mac to have at least one line to sell.

In July 1964, CTS took on the Mac line. Cornwell immediately terminated CTS's distributorship, and shortly thereafter Cornwell opened its branch in California. After CTS switched allegiance and before Cornwell filed suit, both parties vigorously sought to secure the dealers and customers of the other. The antitrust claims stem from the contentions of each that the other's efforts exceeded the bounds of lawful competition.

Cornwell started the litigation by filing a complaint to recover $12,110.72, the unpaid balance of the account for merchandise sold to CTS. The action expanded with the cross-filing of counterclaims. After more than four years of discovery and pretrial proceedings, the cause came to trial before a jury.

CTS stipulated to the amount of Cornwell's claim for the price of merchandise, but it contended that it was entitled to $22,361.29 damages for Cornwell's breach of an alleged oral contract to repurchase the inventory in the event of termination of the distributorship. Cornwell admitted that it did not repurchase CTS's inventory when the distributorship was terminated, but it contended that there had been no agreement to repurchase it.

The contract issues were tried first, excluding the damages issue. Evidence adduced on both sides indicated that the parties had entered an oral agreement that Cornwell would repurchase the inventory upon termination, but there were conflicting versions of the terms of the agreement. Cornwell's motion for a directed verdict was based on the grounds that no oral agreement was enforceable because: (1) California's Commercial Code § 2201 requires that a contract for the sale of goods for the price of $500 or more cannot be enforced unless there is a writing complying with the statute, and (2) California's Commercial Code § 2202 excluded proof of the oral agreement because it contradicted the terms of written purchase orders for the tools. The district court did not direct the verdict on either of those grounds. The court decided to take the contract issues from the jury when, shortly before the jury was to be in-

structed, the court learned that one of the jurors was sick, and Cornwell refused to stipulate to have the questions resolved by eleven jurors. The court explained that it was directing the verdict because it appeared to be the most expeditious way to bring the entire, case before the Court of Appeals.

■ Cornwell recognizes that the direction of the verdict on the contract issues cannot be upheld unless we can say, as a matter of law, that recovery on the claimed oral contract was foreclosed by the statute of frauds or by the parol evidence rule. The statements of those rules in the Commercial Code are irrelevant because the transactions occurred before the Commercial Code became effective, and the Code does not have retrospective application. (Cal.Com.Code § 10101.)

■ The parol evidence rule did not foreclose proof of the oral agreement because there was no evidence that the written purchase orders were intended to be final embodiments of the parties' agreements. The rule is inapplicable to unintegrated writings. (Royal Industries v. St. Regis Paper Co. (9th Cir. 1969) 420 F.2d 449; Masterson v. Sine (1968) 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561.)

■ The statute of frauds did not, as a matter of law, bar enforcement of the oral agreement. The evidence is susceptible to the interpretation that part performance of the oral agreement took the agreement out of the statute. (Cal.Civ. Code § 1724; Monarco v. LoGreco (1950) 35 Cal.2d 621, 220 P.2d 737.)

After the contract issues had been presented, CTS commenced trial of its antitrust counterclaims in accordance with the order of proof adopted in pretrial proceedings. After a week of trial on CTS's counterclaims, the district court halted further proof, and, over the objections of both parties, ordered CTS to suspend its case and directed Cornwell to begin its case-in-chief on its antitrust claims against CTS. Following the conclusion of Cornwell's testimony, the court directed the parties to finish their respective cases on offers of proof. Both parties made written and oral offers of proof. CTS never rested its antitrust case, and rebuttal was not made by either party. At the conclusion of the respective offers of proof, following argument, the court directed verdicts against both parties.

The offers of proof are lengthy. They are a curious compound of documents, depositions, narrations, legal argument, and conclusions. We do not view these offers hypertechnically, however, because we recognize that much of their disorderliness is attributable to the unusual procedural directions that caused them to be produced.

We turn to CTS's antitrust claims against Cornwell.

CTS made five separable antitrust claims against Cornwell, alleging that Cornwell had violated: (1) section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)) by offering discounts in California and Nevada in an attempt to drive CTS out of business; (2) section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13(c)) by paying unearned commissions to dealers in California and Nevada; (3) section 3 of the Clayton Act (15 U.S.C. § 14) and section 1 of the Sherman Act (15 U.S.C. § 1) by forcing its dealers to enter into exclusive dealing contracts; (4) section 1 of the Sherman Act by terminating CTS for refusing to enter into an illegal exclusive dealing arrangement with it; (5) section 2 of the Sherman Act (15 U.S.C. § 2) by attempting to monopolize the sale of tools to mechanics in the California and Nevada area.

CTS's threshold problem in proving a prima facie case for any of its antitrust claims was proof of a well-defined relevant market upon which the challenged anticompetitive actions would have had a substantial impact.

■ Cornwell argues vigorously that CTS's evidence and its offers of proof were inadequate to sustain CTS's prima facie burden on this issue. But it

argues almost as vigorously the opposite side of the same issue when it seeks to overturn the directed verdict against it on its own antitrust claim against CTS. We conclude that there was enough evidence presented and promised by both sides on the issue to foreclose the direction of the verdict on the relevant market score.

There was evidence adduced and offered that professional quality hand tools and related equipment sold by mobile dealers (wagon men) to ultimate consumers constitute a separate product market or line of commerce under the Sherman, Clayton, and Robinson-Patman Acts, that such hand tools are so distinctive that they cannot be compared with other hand tools, and that there are only three manufacturers which market professional quality hand tools in California and Nevada through mobile dealers, namely, Snap-On, Mac, and Cornwell. CTS was ready to prove that these three companies did not face substantial competition from other tool manufacturers in this market for three reasons: First, the tools of these companies are of markedly better quality, particularly in terms of durability, than similar tools manufactured by other companies. Hence, for the professional mechanic, they are not interchangeable with other tools. Second, only these three companies make "specialty tools" for the repair of late model automobiles. Thirty to forty percent of the tools they manufacture and sell are specialty tools needed by professional mechanics and available nowhere else. Third, these three companies sell exclusively through roving dealers, 85 percent of whom are franchised by one of the three companies. Because the marketing mode is convenient and because the dealers often possess expertise upon which consumers tend to rely, professional mechanics seldom purchase tools from any source other than Mac, Snap-On, or Cornwell dealers in California and Nevada.

Upon CTS's full production of the evidence, it may well be, as Cornwell sometimes argues, that dealers with fixed locations actively compete with Mac, Snap-On, and Cornwell for the professional tool trade, that the mode of retailing is not a meaningful basis for distinguishing those three vendors from other tool distributors, and that the share of the properly defined relevant market held by Cornwell, Mac, and Snap-On is so insubstantial as to be beneath the notice of the federal antitrust laws. But we cannot say from the evidence that CTS produced, together with the evidence promised, that a jury could not have found that the market picture was as CTS painted it, or that the jury would have had to find that Cornwell's view of the market was right. The record before us does not permit us to sustain the removal of the relevant market issue from the jury.

■ In discussing the antitrust claims of CTS and of Cornwell, we view the evidence adduced and promised with the same intendments favorable to the proponent against whom the verdict was directed as those mentioned in connection with the relevant market issue.

CTS claimed that Cornwell violated section 2(a) of the Robinson-Patman Act by engaging in discriminatory pricing. Under section 2(a) of the Act, sellers cannot sell like goods to different buyers at different prices if the pricing tends to injure competition in either the buyers' or the sellers' market, unless the price differentials are justified by factors recognized in the Act.

■ CTS sought to prove that Cornwell sold its tools in California and Nevada for less than it did in other parts of the country. The district court foreclosed discovery and attempted proof of that claim, ruling that price differentials outside of California and Nevada were irrelevant. The ruling was erroneous (e. g., F.T.C. v. Anheuser-Busch, Inc. (1960) 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385). Upon remand, the district court will allow CTS an opportunity to establish price differentials between Cornwell's buyers outside of Ne-

vada and California and those within that area.

■ It is unnecessary to detail all evidence introduced or proffered in respect of CTS's section 2(a) claim. A brief sketch will suffice. After termination of CTS's distributorship, Cornwell sold tools to some of its California and Nevada dealers at substantially greater discounts than it gave to others in the same states. That evidence was prima facie sufficient to establish the price discrimination element of its section 2(a) claim. (F.T.C. v. Anheuser-Busch, *supra*.) To meet the anticompetitive-effect requirement, CTS offered to prove that Cornwell sold tools to selected California and Nevada dealers below cost. If CTS makes good its offer predatory intent can be inferred. From proof of predatory intent, the jury could infer anticompetitive effect. (Utah Pie v. Continental Baking Co. (1967) 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406.) It follows that CTS's evidence on its section 2(a) claim was enough to avoid a directed verdict.

■ Section 2(c) of the Robinson-Patman Act makes it unlawful for any person to pay brokerage commissions on the sale of goods to the purchaser, or to anyone acting as the agent of, or on behalf of the purchaser, unless the commissions were earned for services rendered in effecting the sale. CTS offered to prove that Cornwell paid commissions to certain dealers on the sale of products to neighboring dealers, although the former had nothing to do with the sale. CTS says the scheme was to reward dealers for not competing with each other. There is no violation of section 2(c) unless the person receiv-

ing the unearned commissions was under the control of purchasers or acting on behalf of purchasers. CTS offered no proof that the dealers who received commissions fell in either category. The district court properly granted a directed verdict upon CTS's section 2(c) claim.[1]

■ CTS next claimed that Cornwell's exclusive dealing contracts with its dealers violated section 3 of the Clayton Act. The existence of the exclusive dealing contracts was not in dispute.[2] The section 3 issue is whether or not CTS offered enough proof prima facie to establish the requisite anticompetitive impact on the relevant market. CTS offered to prove that 10 to 15 percent of the California and Nevada dealers had entered into such contracts with Cornwell.[3] Although the figure cannot compel a finding of substantiality and, upon full proof, the impact may be insignificant, we cannot say that the evidence was so flimsy as to permit withdrawal of the issue from the jury. In Standard Oil of California and Standard Stations v. United States (1949) 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, the Supreme Court held that the locking up of 6.7 percent of the retail gasoline market permitted an inference of substantial impact. It may be, as Cornwell argues, that the differences between the tool and gasoline markets are such that a 10 percent share of the former is of much less significance than a 6.7 percent share of the latter, but that is an issue that cannot be decided as a matter of law on this record.

■ CTS also claimed that Cornwell terminated its distributorship because CTS refused to enter a nationwide exclusive dealing arrangement with

1. We do not decide whether or not the challenged conduct was, or could have been, a violation of the Sherman Act.

2. The district court excluded the offered contracts on the ground that they were immaterial. Cornwell tacitly recognizes that the exclusion was erroneous.

3. Cornwell objected to the introduction of contracts entered into subsequent to January 18, 1965, the date on which CTS filed its first counterclaim. Regardless of the merits of that contention, which are discussed *infra*, it does not appear from this record that so many of the contracts complained of date from the period subsequent to January 18 as to destroy CTS's argument on anticompetitive effect.

Cornwell whereby distributors were required to deal solely with Cornwell and were required to impose similar restrictions upon their dealers. CTS did not offer a portrait of the national market for mechanics' tools, and the jury could not have found the nationwide aspects of the arrangement to be anticompetitive.[4] However, CTS did offer to prove that had it entered the exclusive dealing arrangement with Cornwell, enough dealers in California and Nevada would have been locked up to have permitted a jury to infer that the arrangement might have had substantial impact on the relevant market. That evidence was enough to prevent taking the issue of the legality of the rejected contract from the jury. Prima facie proof that the rejected contract was violative of the antitrust laws coupled with similar proof that Cornwell terminated the distributorship because CTS refused to enter the illegal contract would make out its prima facie claim that Cornwell violated section 1 of the Sherman Act. (Osborn v. Sinclair Refining Co. (4th Cir. 1960) 286 F.2d 832, cert. denied (1960) 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255.) CTS offered no direct evidence to prove that Cornwell's motivation in terminating the distributorship was CTS's refusal to enter the exclusive dealing arrangement, but it did offer to prove that Cornwell had unsuccessfully exerted pressure on CTS to sign the contract only a month before termination. A jury could have inferred a cause-and-effect relationship between these events. We are mindful of the Supreme Court's admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." (Poller v. Columbia Broadcasting System, Inc. (1962) 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458.)

▇ CTS's final antitrust claim is that Cornwell attempted to gain monopolistic control over the sale of tools in California and Nevada in violation of section 2 of the Sherman Act. CTS offered to prove that Cornwell tried to implement its plan to monopolize by driving CTS out of business. To convert Cornwell's conduct from vigorous competition into a separate Sherman Act offense, CTS had to prove two additional elements: (1) Cornwell had the specific intent to monopolize, and (2) it had sufficient market power to come dangerously close to success. (Swift & Co. v. United States (1905) 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518).

▇ We do not reach the second element because we have concluded that the evidence produced, together with the conclusory statements of the offer of proof, were inadequate to present an issue for the jury in respect of the first element even after we have indulged the full spectrum of intendments in CTS's favor.

▇ With respect to the antitrust claims that are being remanded for trial, we discuss briefly the dispute concerning the relevance of evidence concerning events that occurred after January 18, 1965, the date upon which CTS filed its first counterclaim. Cornwell has consistently objected to the introduction of evidence as to events that occurred after that date; CTS has argued that it may present evidence of events occurring right up to trial. Neither party is entirely correct. CTS cannot present evidence of new antitrust violations occurring after the filing of its counterclaim in an effort to have these violations serve as the basis of recovery, nor can it introduce evidence as to damages suffered after the date of filing due to activities constituting part of a continuing violation of the antitrust laws that occur subsequent to the filing date. (Flintkote Co. v. Lysfjord (9 Cir., 1957) 246 F.2d 368, 394–397.) The proper cut-off date, however, is March 26, 1965, the date on which CTS filed its

---

4. CTS complains that it did not do so because the court's limitations on discovery prevented its access to information about the national aspects of Cornwell's exclusive dealing arrangements. But there is no suggestion that the court's ruling prevented CTS from gathering information on the competitive situation in the national market.

final counterclaims in response to Cornwell's amended complaint. Moreover, if it proves liability, CTS has the right to recover compensation for all past and future damages suffered as a result of Cornwell's alleged violations. Evidence as to actual damages suffered as a result of actions occurring prior to the filing is admissible, even if the damages themselves arose after the counterclaims were filed. Further, evidence of any activity of Cornwell's that may reflect upon its market position or the intentions of its management at the time of the alleged violations is admissible regardless of when it occurred.

We now take up Cornwell's antitrust claims against CTS. Cornwell contends that CTS attempted to monopolize the mechanics' tool market in violation of section 2 of the Sherman Act and that CTS conspired with Mac to achieve that design, likewise in violation of section 2. Cornwell's claims are a mirror image of the CTS claim last discussed, and it suffers similar flaws. The only evidence directed to the specific intent issue is proof that CTS intended to carry both Mac and Cornwell tools. We do not think that evidence under all of the circumstances was enough to carry Cornwell's section 2 claim to the jury. Cornwell makes a great deal of evidence from depositions that tends to indicate that CTS and Mac had conspired to set up exclusive territories for the Mac dealers, a per se violation of section 1 of the Sherman Act. (United States v. Arnold, Schwinn & Co. (1967) 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249.) However, since Cornwell never offered to prove that this practice resulted in, or was likely to result in, the exclusion of any competitors from the relevant market, CTS's intent to engage in this practice cannot serve as the specific intent to monopolize required for a section 2 violation.

The remaining point is Cornwell's complaint that the district court erred in taxing and apportioning costs. Cornwell requested no relief from the order in the district court. The district court has broad discretion in apportioning and taxing costs where, as here, neither party completely prevailed. No abuse of that discretion has been shown in this case.

The judgment is reversed, and the cause is remanded for further proceedings consistent with the views herein expressed. Each party shall bear its own costs on appeal.

On Petition for Rehearing and Petition for Rehearing En Banc.

Before MERRILL, ELY, and HUFSTEDLER, Circuit Judges.

PER CURIAM:

The panel as constituted in the above case has voted to deny the petition for rehearing and to reject the suggestion for a rehearing in banc.

The full court has been advised of the suggestion for an in banc hearing, and no judge of the court has requested a vote on the suggestion for rehearing in banc. Fed.R.App.P. 35(b).

The petition for rehearing is denied and the suggestion for a rehearing in banc is rejected.