JACOBSON & COMPANY,
INC., Plaintiff,

v.

ARMSTRONG CORK COMPANY,
Defendant.

No. 76 Civil 2376.

United States District Court,
S. D. New York.

July 2, 1976.

Moses & Singer, New York City, for plaintiff; David N. Ellenhorn, Joseph L. Fishman, Eugene I. Farber, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant; John H. Wilkinson, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This motion for a preliminary injunction presents the question whether a distributor has been terminated by a manufacturer for legitimate business reasons or in furtherance of a conspiracy or combination in restraint of trade.

The plaintiff, Jacobson & Co. ("Jacobson"), is a contractor in the business of

furnishing and installing acoustical ceiling tile and systems, partitions, and other interior assemblies. Jacobson also operates a "Supply Center" in Elizabeth, New Jersey, from which it sells acoustical ceiling tile and other building materials directly to persons and institutions who do their own installation. The defendant, Armstrong Cork Co. ("Armstrong"), is the nation's largest manufacturer of ceiling systems and materials.

In March 1968 Jacobson was designated by defendant as an authorized distributor of its products in New York City, Long Island, Westchester and Rockland Counties (all in New York State), Fairfield County in Connecticut and Northern New Jersey. Plaintiff was one of a number of Armstrong dealers in those areas.[1] The distributorship arrangement did not restrict plaintiff from selling Armstrong products outside the designated areas. The relationship of the parties continued until March 19, 1976, when Armstrong notified Jacobson that its distributorship was terminated. Soon thereafter, plaintiff brought this action, claiming that the termination violates Sections 1 and 2 of the Sherman Act,[2] Section 3 of the Clayton Act,[3] and the Robinson-Patman Act.[4]

■ Plaintiff seeks a preliminary injunction restraining Armstrong from terminating plaintiff as an authorized distributor and compelling Armstrong to continue to sell its products to plaintiff during the pendency of this litigation. Accordingly, the court must decide whether plaintiff has made "a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly" in its favor.[5]

## I. The Merits

■ The gravamen of Jacobson's charge on this motion is that Armstrong terminated the distributorship because of Jacobson's resistance to Armstrong's unlawful restrictions on the resale of its products in areas outside of those designated in the distributorship agreement. Jacobson grounds its claim on *United States v. Arnold Schwinn & Co.*,[6] which held that it is per se unlawful "for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it."[7] If, as Jacobson contends, Armstrong's purpose to protect its other distributors against competition in their respective designated areas from Jacobson and thereby preserve the integrity of Armstrong's system of territorial distribution contributed substantially[8] to the decision to terminate, then plaintiff ultimately will be entitled to judgment.[9] On the other hand, if the termination was solely for legitimate business purposes such as Jacobson's declining sales volume, its concentration on large jobs that were less profitable to Armstrong, and a deteriorating relationship brought about by Jacobson's many complaints, then Jacobson's claim must fail. As

1. In Long Island plaintiff was designated as Armstrong's sole distributor.

2. 15 U.S.C. §§ 1, 2.

3. 15 U.S.C. § 14.

4. 15 U.S.C. § 13.

5. *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250 (2d Cir. 1973). *Accord, Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356 (2d Cir. 1976); *San Filippo v. United Brotherhood of Carpenters & Joiners*, 525 F.2d 508, 511 (2d Cir. 1975); *Dino DeLaurentiis Cinematografica S.p.A. v. D–150, Inc.*, 366 F.2d 373, 375 (2d Cir. 1966).

6. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

7. *Id.* at 379, 87 S.Ct. at 1865.

8. *See Osborn v. Sinclair Ref. Co.*, 286 F.2d 832, 837 (4th Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); *Phillips v. Crown Central Pet. Corp.*, 395 F.Supp. 735, 769 (D.Md. 1975).

9. *Cf. Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711, 721–23 (S.D.N.Y.), *aff'd*, 417 F.2d 621 (2d Cir. 1969).

the parties recognize, the question is a factual one.[10]

To support its claim, Jacobson relies upon three aspects of its relationship with Armstrong. First, it cites the circumstances surrounding the establishment of its distributorship and the resistance it later met when attempting to expand its operations in the Philadelphia area, where Armstrong had designated another distributor. While Jacobson concedes that Armstrong acknowledged the plaintiff's right to sell in that area, Jacobson contends that in fact Armstrong's actions belied its acknowledgments. Thus, plaintiff asserts that when it sought to penetrate the Philadelphia market Armstrong deliberately placed impediments in its way in order to favor Berger Acoustical Company ("Berger"), Armstrong's designated and principal distributor in that area; that Armstrong refused to quote prices or to provide technical assistance from its regional office in Philadelphia whenever plaintiff planned to bid on jobs or sell Armstrong products there; and that Armstrong intended by such inadequate servicing to restrain plaintiff's competitive activity in the Philadelphia area in favor of Berger. While plaintiff does not contend that there is a direct nexus between its attempts to bid jobs in Philadelphia in 1970–1972 and its termination in 1976, it does assert that its difficulties in entering the Philadelphia market because of impediments placed in its way by Armstrong illustrate Armstrong's desire to protect its territorial distribution system and provide a backdrop against which to view later events. Armstrong, on the other hand, insists that it gave Jacobson all the assistance that it requested and points out that many of its local distributors do business outside their areas of primary responsibility.

The second item plaintiff stresses relates to sales of Armstrong products from Jacobson's Supply Center in Elizabeth, New Jersey. Whereas most Armstrong distributors install the products they sell, Jacobson sells from its Supply Center on a "materials only" basis. The institutions that purchase the material can reduce their costs by installing it themselves, and small contractors who otherwise lack access to Armstrong materials can buy them from Jacobson and bid them on small jobs. In the fall of 1975 Jacobson intensified the selling activities of its Supply Center. It sent a flyer to the trade offering Armstrong products at a substantial discount and mailed over 6,000 advertisements to hospitals, schools, acoustical contractors and other potential customers in Pennsylvania, southern New Jersey and Delaware. Jacobson now asserts, in substance, that Armstrong received complaints from local distributors concerning these sales activities; that Armstrong regarded such activities as a threat to its territorial distribution system; and that Jacobson's termination was in part a reaction to its aggressive Supply Center sales practices. Although Armstrong takes the position that it was unconcerned with Jacobson's Supply Center sales, there is evidence to the contrary. Berger complained to Armstrong about Jacobson's discount sales and its promotional literature, and an interoffice memo by Armstrong's general sales manager with respect to a Jacobson flyer not only takes note of it but expresses the view that Jacobson's method of doing business would anger other distributors and would create problems for Armstrong. Armstrong contends, however, that its concern was not with the sales per se but with the manner of their promotion. It argues that the Jacobson's advertisements were harmful to its interests in that Jacobson disclosed its confidential price list and tended to disrupt its relationship with its other distributors by giving them a false impression that Armstrong had given Jacobson a special deal on prices.

The third item upon which Jacobson focuses concerns a bid in February 1976 for

---

10. The references to facts are drawn from the affidavits and exhibits the parties have submitted. Neither party requested an evidentiary hearing; the inquiry in any case turns not so much on the basic facts but on evaluating the inferences reasonably to be drawn therefrom. See *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1204–05 (2d Cir. 1970); *SEC v. Frank,* 388 F.2d 486, 490–91 (2d Cir. 1968).

the installation of ceilings in a federal office building in Atlanta, Georgià. Before submitting its bid Jacobson asked Armstrong for the pricing information and technical data Jacobson needed to determine whether it would bid Armstrong products on the job. Armstrong initially refused to provide the information unless Jacobson committed itself to bidding Armstrong material. Further, an Armstrong sales representative indicated that Armstrong did not want Jacobson bidding on jobs in the Atlanta area since Armstrong already had adequate coverage there from local distributors. Armstrong finally provided the necessary information when Jacobson objected that Armstrong's refusal to assist it was "anticompetitive." Jacobson won the contract but did not bid Armstrong products. Jacobson was terminated as a distributor three weeks later. Armstrong responds that its reluctance to aid Jacobson in bidding on the contract in Atlanta was not to thwart Jacobson's extraterritorial sales activities; rather, it was based on Jacobson's past history of using Armstrong's price quotations to predict the bids of other Armstrong distributors and to undercut them by bidding competing products. Armstrong emphasizes that it finally did give Jacobson the requested information and that Jacobson in fact did bid competing products and did win the contract for the Atlanta job.

Plaintiff contends that the evidence as to the three items referred to—Armstrong's discouragement of Jacobson's attempts to do business in Philadelphia, Armstrong's reaction to the sales and promotional activities of the Supply Center, and Armstrong's recent unwillingness to assist Jacobson in bidding the Atlanta job—justifies the inference that it was terminated for insisting on its right to resell Armstrong products wherever and to whomever it chose.

Armstrong, over and above its denials of wrongful conduct with respect to these specific items, sets forth business justifications for the termination of Jacobson's distributorship. First, Armstrong stresses that Jacobson's purchases of Armstrong's products dropped from about $1,100,000 in 1973 to about $600,000 in 1975, with prospects of future sales at even lower levels. Moreover, Armstrong contends that Jacobson's jobs in recent years have been primarily large projects upon which Armstrong must offer a price discount, thereby yielding less profit to it. This, combined with Jacobson's cutback in personnel and its abandonment of its branch outlets, indicated poor prospects ahead for Jacobson's sale of Armstrong products. That in fact this was a matter of concern to Armstrong as early as July 1974 and thereafter appears from Armstrong's internal documents; indeed, one Armstrong official recommended Jacobson's termination for these reasons as early as the spring of 1975.

The second business reason advanced by defendant for its termination decision was what it terms a "deteriorating relationship" with Jacobson that began in 1974, worsened as time went on, and by 1976 became "intolerable." Documents presented upon this motion suggest that much of the friction between the parties resulted from Jacobson's frequent complaints about Armstrong's products, misinterpretation of specifications and other matters. Armstrong regarded the complaints as unjustified and mere pretexts by Jacobson to obtain unwarranted allowances.

Jacobson responds to Armstrong's asserted reasons for the termination by noting that its sales volume, though less than it once was, is still relatively large. In 1975 it ranked third among the fifteen authorized Armstrong distributors in the northeast region, with sales more than twice those of the average distributor in its region. Moreover, it notes that other distributors who had similar or even greater declines were not terminated. It stresses that Armstrong never terminated a distributor whose sales approached Jacobson's in volume and that at the time of its termination Jacobson had placed firm orders for Armstrong products in excess of $500,000. As to the alleged "deteriorating relationship" between the parties, Jacobson observes that prior to and at the time of termination no mention was made of this, suggesting that the claim is

mere afterthought. Furthermore, it denies its complaints were more frequent than those of other distributors, none of whom have been terminated.

What emerges from this summary of the parties' fact contentions is that the reason for the termination of plaintiff's distributorship is in sharp dispute. At this juncture it cannot be said that plaintiff has made a compelling case of probable success on the merits; indeed, plaintiff with some understatement acknowledges that "[t]here is, of course, a chance that Armstrong will be able to prove that its refusal to deal with Jacobson resulted from lawful business reasons and not an unlawful act in violation of antitrust laws."

■■ Courts have often recognized, however, that a clear showing of likelihood of success is not a *sine qua non* for preliminary relief where the balance of hardships tips decidedly in favor of the movant. In such cases the plaintiff need only " 'rais[e] questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' " [11] Measured against this alternative standard, plaintiff has sustained its burden on this application. Whatever ultimately is proved about the extent to which Armstrong hampered Jacobson's attempts to do business in Philadelphia, it is clear at least that Armstrong was adverse to such attempts and would have preferred that Jacobson confine its activities to its designated territory. Also, it is significant that the termination occurred barely one month after Jacobson bid a large job in Atlanta against Armstrong's expressed preference that the job be left to its local contractors. So, too, in light of the substantial volume of Armstrong products that Jacobson continued to sell, it is questionable that it would have been terminated solely because of a decline in sales. Perhaps the "something extra" that proved decisive was the so-called "deteriorating relationship" between the parties. The possibility remains, however, that the major source of friction was Jacobson's aggressive resale policies and its continued insistence upon selling wherever and to whomever it pleased. In short, the reason for Jacobson's termination on the instant record remains a matter of substantial doubt. It is a question that deserves more deliberate inquiry than is possible on this motion, made when the parties have not completed discovery and when all the facts are not before the court.[12]

## II. Irreparable Injury and Balance of Hardships

In light of the unresolved questions going to the merits, the equities that support the grant of a preliminary injunction in this case assume particular importance. At the outset, the court rejects the defendant's contention that money damages would make plaintiff whole if ultimately it should prevail. While there appear to be adequate substitutes for many although not all Armstrong products, there is no doubt that Armstrong is the leader in the industry and that its products are often required in architect's specifications. Almost all of Jacobson's major competitors are Armstrong distributors, and Jacobson's purchases from Armstrong far exceed those from other manufacturers. Accordingly, it is likely

11. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205–06 (2d Cir. 1970), *quoting Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953).

12. Armstrong's contention that the termination, even if motivated by anticompetitive purposes, was mere "unilateral action" that does not satisfy the "contract, combination . . . or conspiracy" requirement of Section 1 of the Sherman Act is without merit. That the termination decision was solely that of Armstrong, reached without consultation with third parties, would be of no moment if the termination was part of a general scheme to restrict sales by distributors outside of their assigned territories. *Cf. Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Quinn v. Mobil Oil Co.*, 375 F.2d 273, 276 (1st Cir.), *petition for cert. dismissed*, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967). Here plaintiff alleges such a scheme and has presented evidence which it claims supports its charge that the termination was motivated by Armstrong's desire to protect local distributors from competition from Jacobson.

that Jacobson will be placed at some competitive disadvantage in bidding jobs if Armstrong's refusal to deal with it continues. Whether or not this disadvantage would be as disastrous as Jacobson contends, it is an injury that is difficult of precise calculation in dollars and cents, and this is a factor traditionally relied upon to support injunctive relief.[13] Moreover, Jacobson's advertisements for its Supply Center stress that it is a full service supplier, with access to the material of all leading manufacturers. Almost 80% of the sales from Jacobson's Supply Center in 1976 have been of Armstrong products. Jacobson's loss of this major line would jeopardize plaintiff's good will and its position as a full line, full service supplier, and the risk that its customers will turn to competitors who do have access to Armstrong as well as other products is substantial and could result in immeasurable harm.[14] Whatever the hardship to plaintiff, it heavily outweighs any supposed inconvenience that defendant will suffer when the injunction issues. Defendant concedes that it will not encounter any financial loss by continuing to deal with the plaintiff. Understandably it is reluctant to do so, but that the parties' relationship may be strained does not foreclose relief. Moreover, this is an insubstantial matter, since defendant has agreed, despite the termination notice, to sell plaintiff material so that it can fulfill contracts that were outstanding at the termination date. Thus, there will be, in any event, a business relationship between them that will continue for some time. The court's usual reluctance to issue a mandatory injunction disappears in the absence of any real harm to the defendant and the need to restore the status quo pending final resolution of the difficult issues that have been raised.

Since plaintiff has made a clear showing of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships that tips decidedly in its favor, the motion for a preliminary injunction compelling Armstrong to continue to sell products to it is granted. It is hardly necessary to add that the granting of this relief is no indication of the court's view of the merits of the controversy, the resolution of which must await a trial.[15]

Submit order on consent.

**13.** *See, e. g., Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir. 1969), *aff'g* 295 F.Supp. 711 (S.D.N.Y.1969); *Bergen Drug Co. v. Parke, Davis & Co.,* 307 F.2d 725, 728 (3d Cir. 1962).

**14.** *Cf. Interphoto Corp. v. Minolta Corp.,* 295 F.Supp. 711, 723–24 (S.D.N.Y.), *aff'd,* 417 F.2d 621 (2d Cir. 1969); *Bergen Drug Co. v. Parke, Davis & Co.,* 307 F.2d 725, 728 (3d Cir. 1962);

*McKesson & Robbins, Inc. v. Charles Pfizer & Co.,* 235 F.Supp. 743, 749–50 (E.D.Pa.1964).

**15.** *See, e. g., Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir. 1953); *Missouri-Kansas-Texas R. R. v. Randolph,* 182 F.2d 996, 1000 (8th Cir. 1950); *United States v. Pennzoil Co.,* 252 F.Supp. 962, 987 (W.D.Pa. 1965).