JACOBSON & COMPANY,
INC., Plaintiff,

v.

ARMSTRONG CORK COMPANY,
Defendant.

No. 76 Civ. 2376.

United States District Court,
S. D. New York.

May 9, 1977.

Moses & Singer, New York City, for plaintiff; David N. Ellenhorn, Eugene I. Farber, Jack Levy, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant; Sanford M. Litvack, John D. Gordan, III, Doris K. Shaw, Joan A. Gerrity, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

### EDWARD WEINFELD, District Judge.

Jacobson & Company, Inc. ("Jacobson") brought this action under the antitrust laws seeking damages and an injunction compelling the defendant, Armstrong Cork Company ("Armstrong"), to reinstate it as an authorized distributor of Armstrong products in the New York-New Jersey area. Armstrong is the nation's leading producer of acoustical ceiling products, including ceiling tile and board. Jacobson is a large "interior" contractor, which specializes in the installation of "integrated ceiling systems." Such systems are composed of acoustical ceiling board, suspension materials, light fixtures, air distribution components and, occasionally, background noise generators designed to mask floor noises that are reflected off a ceiling. Jacobson was first appointed an authorized Armstrong distributor in March 1968. Essentially, plaintiff's claim is that Armstrong terminated it as a distributor on March 19, 1976 in furtherance of an effort to impose restrictions on the territories in which and customers to whom authorized distributors could resell Armstrong products. The termination is thus alleged to have violated section 1 of the Sherman Act,[1] which was held by the Supreme Court in *United States v. Arnold, Schwinn & Co.*,[2] to render per se illegal any attempt by a manufacturer "to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it."[3]

On July 2, 1976, the Court issued a preliminary injunction requiring Armstrong during the pendency of this action to continue selling its products to Jacobson on the same terms and conditions, and with the same concomitant services, as such products are sold to Armstrong's authorized distributors.[4] Although the Court at that juncture of the litigation questioned whether Jacobson had shown a probability of success on the merits, it nonetheless concluded that preliminary relief was justified, since Jacobson had raised "sufficiently serious questions going to the merits to make them a fair ground for litigation", and had demonstrated "a balance of hardships tipping decidedly toward [it]".[5] In the absence of a hearing, which neither side requested, the decision to grant the injunction was made on the basis of affidavits submitted to the Court.[6] The Court then observed that the reasons underlying Jacobson's termination were in sharp dispute[7] and that the controverted issues deserved more deliberate inquiry than was possible at that time, when the parties had not had full discovery and

---

1. 15 U.S.C. § 1.

2. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

3. *Id.* at 379, 87 S.Ct. at 1865.

4. 416 F.Supp. 564 (S.D.N.Y.1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977).

5. *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250 (2d Cir. 1973); *see Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 441, 445 (2d Cir. 1977); *Gulf & West-* *ern Indus., Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692–93 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953).

6. *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir. 1977).

7. 416 F.Supp. at 569.

when all the pertinent facts had not been fully developed.[8]

As the case neared trial, on April 19, 1977, Jacobson moved to punish Armstrong for contempt of court for alleged violations of the preliminary injunction in connection with Jacobson's bids on construction projects in Columbia, South Carolina, and New Haven, Connecticut. After oral argument and a review of the submissions of the parties, the Court directed that a contempt hearing be consolidated with the trial of plaintiff's case, since it appeared that Jacobson would seek to introduce evidence relating to the alleged contempt both for the purpose of recovering damages under its complaint and to show Armstrong's motive and intent in terminating Jacobson as a distributor.

At the start of trial, the Court ruled that Jacobson could not introduce evidence relating to the South Carolina and New Haven projects for the purpose of recovering damages because the events complained of occurred subsequent to the institution of suit[9] and because no motion to supplement the complaint had been made.[10] Plaintiff's counsel was then instructed that such evidence would be admitted solely for the purpose of showing Armstrong's alleged motive and intent in terminating Jacobson.[11] Upon the trial before the jury, evidence concerning the South Carolina project was received for the limited purpose stated above.[12]

Although plaintiff in the pretrial order asserted claims for damages only based on Armstrong's alleged acts in connection with the projects in New Haven and South Carolina, no motion was made during trial to supplement the complaint to include those claims and, by plaintiff's own admission, no competent evidence of damages on any of its claims was introduced. Accordingly, at the conclusion of plaintiff's case, the Court granted Armstrong's motion for a directed verdict on the claim for damages. Because only equitable issues remained in the case, the jury was dismissed and the Court resumed the trial as the trier of fact with respect to plaintiff's claim for injunctive relief.[13] Upon the continued trial both parties were afforded an opportunity to submit additional evidence on the contempt claims.

The consolidated trial and hearing generated a transcript of testimony totalling over 1,000 pages and extended over six trial days. Sharply contested issues of fact de-

---

**8.** *Id.*

**9.** *See Shayne v. Madison Square Garden Corp.,* 491 F.2d 397, 401 (2d Cir. 1974); *Cornwell Quality Tools Co. v. C. T. S. Co.,* 446 F.2d 825, 832–33 (9th Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 673–74 (9th Cir. 1963); *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 394–97 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.,* 101 F.2d 79, 81 (2d Cir. 1939); *Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc.,* 383 F.Supp. 586, 588 (E.D.Pa.1974).

**10.** *See Poster Exchange, Inc. v. National Screen Serv. Corp.,* 517 F.2d 129, 131 n.4 (5th Cir. 1975); *Shayne v. Madison Square Garden Corp.,* 491 F.2d 397, 401 (2d Cir. 1974).

**11.** Fed.R.Evid. 404(b); *Federal Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Belmont Indus., Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434, 438–39 (3d Cir. 1975); *Cornwell Quality Tools Co. v. C. T. S. Co.,* 446 F.2d 825, 833 (9th Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 673–74 (9th Cir. 1963).

**12.** Because events complained of in connection with the New Haven, Connecticut, project occurred after the close of discovery, and because plaintiff had neither moved to reopen discovery nor afforded the defendant discovery with respect to such events, no evidence concerning the New Haven project was allowed to be introduced before the jury. However, the Court considered the affidavits of the parties on this issue and after the discharge of the jury invited, during the continued trial, the submission of evidence on the alleged contempt.

**13.** *See, e. g., Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 680 (9th Cir. 1976); *Filmon Process Corp. v. Sirica,* 126 U.S.App. D.C. 395, 379 F.2d 449, 451–52 (1967); *Ring v. Spina,* 166 F.2d 546 (2d Cir.), *cert. denied,* 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368 (1948). *See also* Fed.R.Civ.P. 39(a)(2); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

veloped with respect to plaintiff's claim for injunctive relief and its contempt motion.

## CLAIM FOR INJUNCTIVE RELIEF

Jacobson seeks to be reinstated as an authorized Armstrong distributor under section 16 of the Clayton Act, which authorizes a private party to sue for injunctive relief "against threatened loss or damage by a violation of the anti-trust laws".[14] The gravamen of plaintiff's claim is that Armstrong has violated section 1 of the Sherman Act because its termination of Jacobson was an act in furtherance of an agreement, combination or conspiracy to impose restrictions on the territories within which Jacobson could resell Armstrong products and on the types of customers to which such products could be resold.[15] Specifically, Jacobson asserts that Armstrong attempted to restrain it both from selling Armstrong products in the Philadelphia, Pennsylvania area, where Armstrong had a longstanding relationship with a major approved distributor, and from bidding against local Armstrong contractors or distributors to secure contracts for installation of ceiling systems in government office buildings to be constructed in Atlanta, Georgia and Columbia, South Carolina. In addition, Jacobson contends that Armstrong was opposed to the operation of a "Supply Center" by Jacobson in the Philadelphia area, which wholesaled Armstrong products directly to independent contractors, institutional buyers and other customers who installed such products themselves. According to Jacobson, its active promotion of this type of marketing ran afoul of Armstrong's policy of having its own authorized contractors install its commercial, as opposed to residential, ceiling products.

Jacobson did not assert at trial that these alleged attempts or inclinations to impose territorial and customer restraints on resales actually had an impact on its business or property;[16] rather, it offered evidence of them to show that Jacobson's sales and attempted sales of Armstrong products outside its assigned territory substantially contributed to defendant's decision to terminate Jacobson's distributorship.

As this Court noted in its decision of Jacobson's motion for preliminary relief, Armstrong's liability turns on an issue of fact. If Armstrong was involved in a conspiracy or combination[17] to protect various of its distributors against competition from Jacobson in their respective designated areas or to confine sales of Armstrong products to customers who use Armstrong contractors to install such products, and if

---

14. 15 U.S.C. § 26.

15. See United States v. Arnold, Schwinn & Co., 388 U.S. 365, 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Knutson v. The Daily Review, Inc., 548 F.2d 795, 807 (9th Cir. 1976); Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1313 (5th Cir. 1976); World of Sleep, Inc. v. Stearns & Foster Co., 525 F.2d 40, 44 (10th Cir. 1975); Reed Bros., Inc. v. Monsanto Co., 525 U.S. 486, 494–95 (8th Cir. 1975), cert. denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637, 639 (10th Cir.), cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973); Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968).

16. See 15 U.S.C. § 15; Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1004 (2d Cir. 1970), cert.

denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed. 452 (1971).

17. 15 U.S.C. § 1. Although section 1 is directed only at joint action, see Interstate Circuit v. United States, 306 U.S. 208, 226–27, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Modern Home Institute, Inc. v. Hartford Accident & Indem. Co., 513 F.2d 102, 108 (2d Cir. 1975); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2d Cir. 1962), the "agreement" necessary to establish a section 1 violation need not be express, may be implied from the circumstances, see Interstate Circuit, supra at 226–27, 59 S.Ct. 467, and may be found to exist in a territorial restraint case if the defendant, by his own coercive actions, has put together a system of territorial restraints to which his customers or distributors adhere. See Reed Bros., Inc. v. Monsanto Co., 525 F.2d 486, 495 (8th Cir. 1975), cert. denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); Osborn v. Sinclair Ref. Co., 324 F.2d 566, 574 & n.13 (4th Cir. 1963).

these considerations contributed substantially[18] to the decision to terminate Jacobson, then plaintiff is entitled to judgment. If, as Armstrong contends the decision to terminate was based solely on legitimate business reasons such as Jacobson's declining purchases and the prospect of a further decline, its concentration on large jobs and disregard for other substantial portions of the market, its excessive and unjustified complaints, and its deteriorating relationship with Armstrong, then Jacobson's claim must be dismissed.[19]

■ Based upon the Court's own trial notes, which include contemporaneous appraisal of each trial witness, a word-by-word reading of the entire trial transcript, the demeanor of the trial witnesses and assessments of their credibility, and consideration of the trial exhibits, the Court concludes that the plaintiff has failed to carry its burden of proof with respect to the existence of any conspiracy, contract or combination in restraint of trade and with respect to whether Armstrong's decision to terminate was influenced by a purpose to restrict the territories in which, or customers to which, its products could be sold.

In asserting that its termination was influenced by improper motives, Jacobson relies principally on alleged incidents relating to its Philadelphia area sales and its bids on federal construction projects in Atlanta and South Carolina. This reliance must fail. With respect to significant conflicts in the evidence concerning these matters, the Court accepts the testimony of defendant's witnesses. Armstrong neither imposed nor sought to impose any restraint upon plaintiff's Philadelphia sales; indeed, plaintiff has been freely selling Armstrong products in sizeable quantities in the Philadelphia area since 1970, when it first began stocking such products in its nearby Elizabeth,

New Jersey warehouse. Although Jacobson was not given access to Armstrong's Mid-Atlantic Sales Office since it was not an authorized distributor in that area, special pricing information for large jobs and other services provided by that office were made available to Jacobson through Armstrong's Northeastern Regional Office in Saddlebrook, New Jersey. The Saddlebrook office was the assigned office for the area in which Jacobson was designated as a distributor. The fact that Jacobson had to contact the office in its own authorized region for these services was not burdensome to it and did not constitute nor was it intended to constitute a restraint on its Philadelphia area sales.

Jacobson's contention that Armstrong was opposed to its wholesaling activities, which were carried on at its Supply Center in Elizabeth, New Jersey, is wholly without merit. The evidence establishes that a substantial number of Armstrong contractors and distributors make wholesale sales of Armstrong products to customers who install such products themselves. At least one large Armstrong contractor in the New York area, in addition to Jacobson, freely and actively promotes such sales through advertising and other means. Armstrong has not discouraged or interfered with this method of marketing, and, indeed, has on occasion promoted the wholesaling activities of its contractors and distributors. Armstrong did, on one occasion, voice some objection to a flyer mailed by Jacobson to Philadelphia area contractors, which advertised a wholesale sale of Armstrong products. The complaint, however, was not based on the fact that Jacobson was selling at wholesale. Rather, it was directed at Jacobson's public disclosure of what Armstrong considered to be confidential prices and at the possible effect the advertisement might have of leading other Armstrong

18. See Osborn v. Sinclair Ref. Co., 286 F.2d 832, 837 (4th Cir. 1960), cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); Phillips v. Crown Central Pet. Corp., 395 F.Supp. 735, 769 (D.Md.1975).

19. See Reed Bros., Inc. v. Monsanto Co., 525 F.2d 486, 494 (8th Cir. 1975), cert. denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971); Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711, 721 (S.D.N.Y.), aff'd, 417 F.2d 621 (2d Cir. 1969).

contractors to believe, contrary to the fact, that Jacobson was receiving better prices from Armstrong than they.

Finally, the evidence offered with respect to the federal construction projects in Atlanta and South Carolina does not support Jacobson's contention that Armstrong attempted or desired to restrain it from bidding on these jobs in order to protect local Armstrong contractors from extraterritorial competition. Armstrong neither entered into any agreement, express or tacit, nor pursued any policy, the purpose of which was to restrain its contractors from bidding on projects outside their designated territories. In fact, Armstrong contractors regularly bid on government jobs outside the areas in which they were authorized, and Armstrong took no action to restrict this activity.

Jacobson sought Armstrong pricing information for the Atlanta and South Carolina projects, not because it intended to consider bidding Armstrong products on these jobs, but because it desired to obtain information about the prices at which competitive bids would be made and to adjust its own bids, based on its independently developed ceiling systems, accordingly. At any rate, Armstrong gave Jacobson pricing information on the complete Armstrong ceiling system for the Atlanta project when asked to do so. Armstrong even attempted to obtain a commitment from Jacobson to use Armstrong products on the job, but, as noted, Jacobson intended at the time to bid its own system, using a competitor's ceiling board. When Jacobson refused to commit itself to Armstrong, the latter nevertheless promptly provided Jacobson with all information requested for the job.

After the bidding on the Atlanta project, Armstrong altered its largely unsuccessful policy of selling entire ceiling systems, including components purchased from other manufacturers, for large construction jobs and instead began to sell only its ceiling board in connection with such jobs. Jacobson first contacted Armstrong to obtain its pricing on the Columbia, South Carolina, job on or about September 13, 1976. By this time, Jacobson had already determined to bid a ceiling system of its own design, which was developed by a bidding "team" of consultants and subcontractors put together by Jacobson. Again, Jacobson sought to obtain prices on an Armstrong system in order to adjust its own bid. Upon being advised that Armstrong no longer was quoting an entire system, Jacobson lost interest in obtaining any prices from Armstrong. Armstrong offered to quote Jacobson ceiling board if Jacobson would indicate what quantities, sizes and delivery dates it required, but Jacobson never recontacted Armstrong with this information. Although it realized that Jacobson was no doubt bidding its own system on the Columbia job, as it had in Atlanta, Armstrong stood ready, if requested, to provide Jacobson with technical assistance in integrating other ceiling system components with Armstrong ceiling board for use on the Columbia job. No such assistance was ever requested.

In sum, plaintiff's evidence fails to support its claim that Armstrong's decision to terminate it as a distributor was influenced by any purpose to impose territorial or customer restrictions on resales of its products. Plaintiff has thus failed to carry its burden of proof with respect to the elements of a section 1 violation.[20]

---

**20.** Plaintiff has failed both to show that Armstrong entered into any agreement, as that term is used in section 1, relating to territorial or customer restrictions, and that Armstrong's termination of plaintiff was in any way causally connected to such restrictions. *See* notes 17–19, *supra.* Jacobson's reliance on what it terms a "letter agreement" between the parties dated March 28, 1968, as establishing the necessary agreement, is misplaced. Far from imposing a territorial restriction on sales in the Philadelphia area, that letter merely referred to

the fact that Armstrong did not at the time wish to authorize Jacobson as a distributor in that area but might at some future date decide to do so. The Court is satisfied that the letter was neither intended by Armstrong nor understood by Jacobson to prohibit the latter from selling in the Philadelphia area. Indeed, long before the institution of this lawsuit, Armstrong repeatedly assured Jacobson that it had an undeniable right to sell wherever it wished, which Armstrong recognized and respected.

Moreover, even if the burden of persuasion on the issue of termination were upon the defendant, the evidence upon the entire case would establish that Armstrong's action was taken solely for legitimate business purposes. The Armstrong decision to terminate plaintiff's distributorship was the culmination of a series of events extending over a long period, not related to Jacobson's wholesaling activities or extraterritorial sales or bidding, which evidenced a serious degeneration of the parties' relationship. Many such incidents involved Jacobson's chief executive who, by his aggressive attitude and methods, brought about discord between the parties, which degenerated into mutual distrust, worsened with each encounter, and eventually led to a final deterioration in their relationship. While it may be that no one single item caused this result, the totality of events, antedating the Atlanta project, brought about the decision to end the relationship. These included the diminution in plaintiff's purchases from Armstrong, the prospect of even further declines in such purchases, the change by plaintiff of the method of operation of its business, its concentration on large projects, and the excessive number of complaints and claims for credits made by plaintiff against Armstrong. In sum, the decision to terminate Jacobson as a distributor was not an act in furtherance of any agreement or understanding to restrict the areas in which, or customers to whom, Armstrong products could be sold by its authorized distributors. On the contrary, the decision was made solely for legitimate business reasons, was not motivated by any desire to effect results forbidden by the antitrust laws, and indeed had no such effects.

## CONTEMPT MOTION

Jacobson seeks to have Armstrong punished for contempt for its alleged refusals to provide Jacobson services, including technical assistance, in connection with Jacobson's attempts to obtain government contracts for the installation of ceiling systems in federal office buildings to be constructed in Columbia, South Carolina, and New Haven, Connecticut. Insofar as it is pertinent here, the preliminary injunction issued by this Court on July 13, 1976 provided:

[T]he defendant, its agent, servants, and employees are directed to sell to plaintiff defendant's ceiling system products on such terms, conditions and prices and with the same services, as regularly provided to Armstrong ceiling systems contractors, pending resolution of the merits of this action upon trial. . . .

Jacobson claims that Armstrong, at the time the South Carolina project was bid, possessed plans and technical information concerning a highly complex ceiling system that incorporated substantial energy-saving features, stemming primarily from the use of a newly-developed light fixture. This system was designed by Armstrong, in a joint venture with Carrier Corporation, in response to a Government Services Administration program under which government contract bid prices based on specially-designed ceiling systems are readjusted, in

Because no prohibited contract, combination or conspiracy has been shown by plaintiff, the Court finds it unnecessary to reach the issue whether "firm and resolute" enforcement of a territorial restriction, see *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), must be shown in order to make out a per se violation of section 1 under the *Arnold, Schwinn* case. At least two Courts of Appeals have indicated that "firm and resolute" enforcement is only necessary when no express contractual provision limiting sales exists. See *Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 807 (9th Cir. 1976); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1318–19 (5th Cir. 1976) (holding that "firm and resolute" enforcement need not be shown when a distrib-

utorship agreement contains a designation of an area of primary responsibility). It is apparently the rule in this circuit, however, that even an express contractual restriction on territories in which goods may be resold requires "firm and resolute" enforcement to be actionable. *Janel Sales Corp. v. Lanvin Parfums, Inc.*, 396 F.2d 398, 406 (2d Cir.), *cert. denied*, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). See also *Redd v. Shell Oil Co.*, 524 F.2d 1054, 1058 (10th Cir. 1975), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976). As noted, Armstrong has never attempted to enforce territorial restrictions on Jacobson, "firmly and resolutely" or otherwise.

determining the lowest bid, to reflect energy savings that such systems generate over the expected life of a building. Jacobson contends that Armstrong withheld these plans and technical materials when Jacobson requested information on Armstrong's system for the Columbia job, and that Armstrong gave the information to a local contractor in South Carolina who employed it in submitting what proved to be the winning ceiling system bid. With respect to the New Haven job, Jacobson admits that Armstrong gave it all requested technical information concerning the new ceiling system, but contends that Armstrong influenced the manufacturer of a light fixture necessary to the system not to sell that fixture to Jacobson. Thus, according to Jacobson, Armstrong rendered the technical information useless to it. These two incidents are alleged to have constituted violations of that part of the preliminary injunction requiring Armstrong to provide Jacobson with services regularly provided other contractors in connection with the sale of Armstrong ceiling products.

■ On the totality of the evidence presented, both at the trial and in submissions on the contempt motion, the Court finds that plaintiff has not carried its burden of showing by clear and convincing evidence[21] that Armstrong has violated the preliminary injunction. The obvious purpose of the injunction was to preserve Jacobson's status as a distributor of Armstrong products, and thus as a "full-line" supplier, during the pendency of the lawsuit. The reference to provision of "services" in the injunction, read in light of its purpose, does not clearly require Armstrong to assist Jacobson in winning government contracts by providing it technical information of the type developed by the joint venture upon which to base a bid. Assuming, however, that the injunction is broad enough to encompass provision of technical information in connection with bids on government contracts, plaintiff has nevertheless failed to demonstrate any violations.

Thus, when Jacobson approached Armstrong about the South Carolina project, Jacobson was already committed to bidding its own ceiling system. It was only interested in obtaining a price quote on a complete Armstrong system, which Armstrong had discontinued selling, and Jacobson only sought such a quote in order to adjust the bid price on its own system. Jacobson was not contemplating the purchase of Armstrong ceiling products, and, indeed, when Armstrong offered to sell Jacobson ceiling board, the latter never specified to Armstrong the sizes and quantities of board required for the South Carolina job. Jacobson's president, who contacted Armstrong, was an experienced and knowledgeable contractor and was well aware that Armstrong stood ready to provide him or any other contractor with technical assistance upon request. Understandably enough, Jacobson's president neither wanted technical information nor indicated in any way to Armstrong that he desired such information. The preliminary injunction did not require Armstrong to provide Jacobson with technical assistance in the absence of any request, and upon the record there is no basis to hold Armstrong in contempt in connection with the South Carolina project.

■ Finally, Armstrong cannot be faulted under the injunction for the refusal of Edison-Price, a light fixture manufacturer, to quote Jacobson on a fixture that could be used in the energy-saving ceiling system designed by Armstrong and Carrier. Plaintiff has not shown that Armstrong influenced, or could have influenced, Edison-Price's decision.

In sum, plaintiff has failed to carry its burden of proof with respect to its claim for injunctive relief and with respect to its motion to have Armstrong held in contempt of court. Plaintiff's complaint is therefore dismissed in its entirety with prejudice, and

---

21. *Consolidation Coal Co. v. United Mine Workers Local No. 1784,* 514 F.2d 763, 766 (6th Cir. 1975); *NLRB v. Alamo Express, Inc.,* 395 F.2d 481, 482 (5th Cir. 1968); *Hart Schaffner &* *Marx v. Alexander's Dep't Stores, Inc.,* 341 F.2d 101, 102 (2d Cir. 1965); *Stringfellow v. Haines,* 309 F.2d 910, 912 (2d Cir. 1962).

plaintiff's contempt motion is denied. Judgment may be entered accordingly.

The foregoing, together with the stipulated facts as set forth in the pretrial order, shall constitute the Court's Findings of Fact and Conclusions of Law.